In the Matter of the Probate of the Alleged Last Will and Testament of GEORGE D. HENDERSON, Deceased.

NELLIE HACKETT, Individually and as Executrix Named in Will of GEORGE D. HENDERSON, Deceased, and ELISHA FREEMAN, Proponents, Appellants; IDA WILSON, Contestant, Respondent.

Fourth Department, December 23, 1937.

*Menzie & Menzie* [*Charles B. Bechtold* of counsel], for Nellie Hackett, individually and as executrix named in will, etc., proponent, appellant.

*Bechtold & Bernstein* [*Charles B. Bechtold* of counsel], for Elisha Freeman, devisee, proponent, appellant.

*Ivan V. Sturge* [*D. Mordecai Greenberg* of counsel], for Ida Wilson, contestant, respondent.

TAYLOR, J. George Henderson died on September 29, 1936, leaving him surviving, as his only heirs at law and next to kin, two sisters, Nellie Hackett and Ida Wilson. His will was offered for probate by Mrs. Hackett who was named executrix therein; Mrs. Wilson objected to its probate upon the grounds that the will was not duly executed; that decedent lacked testamentary capacity and that the execution of the will was obtained by undue influence. Upon the trial of these issues the surrogate directed a verdict in favor of the proponent on the issue of due execution and submitted the remaining questions to the jury which found that decedent was competent to make a will but that the will offered for probate was the result of undue influence practiced upon decedent.

Nellie Hackett and Elisha Freeman, beneficiaries under the will, appeal from the decree denying probate.

The record discloses the following uncontroverted facts: Decedent was a colored man seventy-two years of age and unmarried; he was illiterate and customarily used a cross-mark for his signature; he was a church member and chairman of the board of trustees of a colored lodge of Elks; he had made his home with a Mrs. Young, also colored, for upwards of forty years; for several years before her death he did most of the housework, took care of the chores, washed her auto and drove it for her; he was also employed as a porter in a clothing factory until 1933, after which he devoted his entire time

to the care of Mrs. Young until her death on March 22, 1936, at the age of eighty-nine years; Mrs. Young, by her will, gave all of her real property, consisting of a house and lot at 91 Canton street, Rochester, N. Y., worth $4,000, and a house and lot at 90 South Ford street, Rochester, N. Y., worth $3,000, to decedent, and her personal property, amounting to approximately $19,000, to decedent and his sister, Mrs. Hackett, in equal shares, and appointed the decedent and Edward Hackett, husband of Nellie Hackett, executors; she left nothing to her only heirs at law and next of kin, Elisha Freeman, a nephew, of Cleveland, Ohio, and Rebecca Holmes, a niece, of Rochester, N. Y.

Immediately after the death of Mrs. Young, Mrs. Hackett and her husband went to live with decedent at 90 South Ford street and continued to live with him until his death six months later. While decedent owned the house, the furniture and furnishings were a part of the personalty bequeathed by Mrs. Young to decedent and Mrs. Hackett. On August 31, 1936, decedent made a trip to Cleveland in his automobile where he visited the Freemans for two weeks; Mrs. Freeman made the return trip with him and visited at his home for several days. On Monday, September twenty-first, decedent became ill and was cared for by Mrs. Hackett; he was first attended by his physician on Thursday, September twenty-fourth; the doctor last visited him on Sunday; he did not deem it necessary to call on Monday because of his patient's improved condition; his temperature was normal but the heart rate was from 130 to 140; secondary anemia was also present and the doctor decided to send him to the hospital on the following Tuesday to determine its cause, but on that morning he was called to the house where he found decedent fully dressed, lying on a couch in the living room and drawing his last breath. In the death certificate the doctor gave the cause of death as lobar pneumonia, type 32; contributory causes, secondary anemia from hematuria and chronic myocarditis (fatty degeneration).

Decedent executed this will one hour before his death; it was prepared by his attorney according to instructions given him by decedent on the preceding day; at nine-thirty o'clock in the morning on the day of decedent's death the draftsman and his son, who was also his law partner, went to decedent's house where the will was executed in the form prescribed by statute; the two lawyers were the subscribing witnesses. Mr. and Mrs. Hackett were also present in the room. The will devised the house and lot at 91 Canton street to Elisha Freeman, the nephew of Mrs. Young, gave $200 to decedent's church and gave all the rest of his property, both real and personal, to his sister, Mrs. Hackett. His sister, Mrs. Wilson, was not mentioned in the will; while their relations were not

unfriendly, decedent had seen her only twice in thirty years, the last time being four years before his death when she visited Rochester from Pittsburg where she lived; on this occasion she stayed for a few days at 90 South Ford street with Mrs. Young and decedent.

In addition to these uncontroverted facts, it appears from the testimony of disinterested witnesses that, during decedent's last illness, he was freely visited by his friends and associates who found him apparently recovering, discussed some business matters with him and, on the day preceding his death, found him sitting up, fully dressed and expecting his lawyer.

The draftsman of the will, whose testimony is challenged as partisan because he represented the proponent on the trial, testified that he was informed by Mr. Hackett that decedent was about to go to the hospital and wished to see him; that, as the result of this message, he went to decedent's house that afternoon where he found him dressed and sitting in a chair in his bedroom; that after greeting him he said, " George, I understand you are going to the hospital," to which decedent replied that he did not intend to go; that he suggested to decedent that he ought to make a will; that the provisions of the will were then discussed by them alone; that as he was ready to leave Mrs. Hackett entered the room and he said to her in the presence of decedent, " Nellie, George has left you practically everything;" that Mrs. Hackett asked decedent if he did not intend to leave something to his sister, Mrs. Wilson, to which he replied that he did not intend to do so; that until Mrs. Wilson was mentioned by Mrs. Hackett, the draftsman had not known that decedent had two sisters; that on the following morning he returned to decedent's house with the will which he had prepared and found decedent fully dressed and sitting on a chair in the dining room; that he read the will aloud to decedent in the presence of Mr. and Mrs. Hackett; that after he had finished reading, Mrs. Hackett again asked her brother if he did not intend to leave something to Mrs. Wilson and he replied that he did not, but that she could do so if she wished. The latter part of this testimony was corroborated by the draftsman's son.

The draftsman further testified that he had been the attorney for Mrs. Young for many years and that just prior to her death she desired to change her will, made five years earlier, by making a bequest to her nephew, Elisha Freeman; that it was then deemed too late to make such a change but decedent promised Mrs. Young that he would see that her wishes were carried out; that a $500 check, drawn upon funds of the Young estate shortly after her will was probated, payable to the order of decedent and indorsed by him to Elisha Freeman, was a payment on account in accordance with decedent's promise to Mrs. Young.

Contestant called as a witness one Carrie Hull, a cousin of decedent, who testified that approximately three months previous to his death decedent told her that the Hacketts were away for a few days on a visit; that he said, " I am going after them Saturday night, but I don't care whether they come back or not because she's always after me to make a will and I'm not going to make any will. I don't intend to make a will. Let them fight for it." This witness further testified: " And my cousin, Mrs. Hackett, told me herself she certainly couldn't get him to make a will; that every time she spoke about making a will or having [the lawyer] come to the house, he'd raise the roof off of the house."

Contestant also called three physicians who, without ever having attended or seen decedent, in answer to a hypothetical question, expressed the opinion that, assuming decedent's death was due to lobar pneumonia, he would have been toxic and mentally confused for forty-eight hours preceding his death and without testamentary capacity during that period.

The foregoing is substantially a *résumé* of all of the evidence in the case bearing upon the issue of undue influence. Viewing the evidence in the light most favorable to contestant, it appears that decedent's physical condition was such that his will might have been overcome by even a slight degree of undue influence; that decedent depended upon Mrs. Hackett for care and attention during his illness; that three months prior to decedent's death, Mrs. Hackett requested him to make a will; that Mrs. Hackett told her husband that decedent wished to see his lawyer and that Mr. Hackett delivered this message which resulted in the preparation and execution of the will; that decedent had made no prior will and had expressed an intention not to make a will; that Mrs. Hackett received a larger portion of his estate under the will than she would have received if he had died intestate; that the will left nothing to, and did not mention, the contestant who was a natural object of decedent's bounty. These are the operative facts which contestant must rely upon to prove her case.

Contestant asserts, and the jury has found, that these facts necessarily lead to the conclusion that although decedent was competent to make a will and the will which he made was duly executed, it was not the free and unrestrained expression of decedent's mind but was actually the product of the mind of Mrs. Hackett; that decedent was impelled to make it " by constant pressure, persuasion and effort, so that the mind of the testator is not left free to act intelligently and understandingly." (*Marx* v. *McGlynn*, 88 N. Y. 357, 370.)

These operative facts, standing alone and unexplained, might permit the inference of undue influence, thus presenting a question of fact for the jury (*Hagan* v. *Sone*, 174 N. Y. 317), but when considered in connection with the associated facts in this case, they are not sufficient to support the inference. Proof of the circumstance that the will was an unnatural one is lacking; in the absence of such proof, the chain of circumstances is not complete. The finding of the jury, therefore, that undue influence was exercised, rests only upon suspicion and conjecture.

Undue influence is a fact which must be proved by the contestant and not merely assumed to exist. (*Matter of Smith*, 95 N. Y. 516; *Matter of Ruef*, 180 App. Div. 203; affd., 223 N. Y. 582; *Matter of Rundles*, 216 App. Div. 658.) Like any other fact, it may be proved by circumstantial evidence but the circumstances must lead to it not only by fair inference but as a necessary conclusion. To avoid the will of a competent testator on the ground of undue influence, the contestant must show facts entirely inconsistent with the hypothesis of the execution of the will by any means other than undue influence. (*Matter of Ruef*, 180 App. Div. 203; affd., 223 N. Y. 582; *Matter of Seagrist*, 1 App. Div. 615, 619; affd., 153 N. Y. 682; *Gardiner* v. *Gardiner*, 34 id. 155; *Matter of Dowdle*, 224 App. Div. 450; affd., 256 N. Y. 629; *Matter of Bundy*, 217 App. Div. 607, 612.)

" In order to prove a fact by circumstances, there should be positive proof of the facts from which the inference or conclusion is to be drawn. The circumstances themselves must be shown and not left to rest in conjecture, and when shown it must appear that the inference sought is the only one which can fairly and reasonably be drawn from these facts." (*Ruppert* v. *Brooklyn Heights R. R. Co.*, 154 N. Y. 90, 94. See, also, *Lamb* v. *Union R. Co.*, 195 id. 260, 266; *Potts* v. *Pardee*, 220 id. 431, 433.)

Contestant places much stress upon the testimony that Mrs. Hackett admitted requesting decedent to make a will. " A person has the right to use any reasonable and legitimate argument to induce another to make a will in a particular way. The giving of advice and the use of argument and persuasion do not constitute ground for avoiding a will made by a competent testatrix even if the will is made in conformity with the advice so given." (*Smith* v. *Keller*, 205 N. Y. 39, 44.)

Contestant also stresses the testimony that decedent had previously expressed an intention not to make a will. Testimony of prior declarations by a testator that he did not intend to make a will has little tendency to prove a change in a fixed testamentary intention. (*Matter of Campbell*, 136 N. Y. Supp. 1086, 1106.)

This will was not unnatural; decedent's entire estate came to him through the will of Mrs. Young to the exclusion of her next of kin, of whom Elisha Freeman was one. Under such circumstances, the devise to Elisha Freeman was both just and natural; the gift of the remainder of his estate to the sister with whom decedent had been on intimate and friendly terms for many years and the disinheritance of the sister who was practically a stranger to him and who had never been dependent upon him, were not unnatural.

These considerations lead to the conclusion that the question of undue influence should not have been submitted to the jury.

The decree denying probate to this will should be reversed on the law and facts, with costs to appellants, and the matter remitted to the Surrogate's Court of Monroe county to enter a decree admitting the will to probate.

All concur. Present — SEARS, P. J., EDGCOMB, CROSBY, LEWIS and TAYLOR, JJ.

Decree so far as appealed from and the order reversed on the law and facts, with costs to the appellants, and matter remitted to the Surrogate's Court with directions to admit the will to probate.