FOURTH DEPARTMENT, MARCH, 1940.
(March 6, 1940.)

In the Matter of the Probate of the Last Will and Testament of LOUIS FRANKEL, Deceased.

CHARLES FRANKEL and Another, Proponents, Appellants; CLARENCE W. McKAY, Special Guardian, etc., Appellant; ESTELLA FRANKEL, Widow, Contestant, Respondent.

All concur, except Crosby, P. J., who dissents and votes for reversal and remitting the matter to the Surrogate's Court with directions to admit the will to probate, in an opinion, and Harris, J., not voting. Present — Crosby, P. J., Cunningham, Taylor, Dowling and Harris, JJ.

CROSBY, P. J. (dissenting). I concur in a reversal of the decree denying probate, but I think that this court should direct that the will be admitted to probate. (Surr. Ct. Act, § 309.)

Louis Frankel died on the 15th day of May, 1937, leaving a will dated October 19, 1927. He left a widow, Estella Frankel, who was a second wife, and three children, Rose Joffe, Freda Bruml and Saul Frankel. By his will he appointed his son, Saul Frankel, and his brother, Charles Frankel, executors, and, out of a large estate, the exact amount of which does not appear, he bequeathed only $10,000 to his wife, and she has, thus far, successfully contested the probate of the will. The contest was made on all the usual grounds, including lack of testamentary capacity, failure of due execution and undue influence. Upon the trial before the surrogate and a jury it conclusively appeared that the will was duly executed under the supervision of skilled counsel and the defense in that respect as well as in respect to lack of testamentary capacity was abandoned.

The jury unanimously answered in the affirmative the one question submitted to them: " Was the execution of the paper, Exhibit 1, bearing date October 19th, 1927, procured by undue influence practiced upon Louis Frankel."

This appeal is from so much of the decree, entered on that verdict, as denies probate.

Almost the entire record is taken up with proof that testator and his wife were not on good terms, that he disliked all her relatives, that he resented the aid and hospitality that she extended to them, and sympathized with his own children in their dislike of her.

There is no dispute about these facts, in fact the respective sides vied with each other in proving them. There is only this difference in the manner in which the respective sides proved these facts — the proponents sought to make it appear that testator was justified in the opinion he held concerning his wife, and the contestant sought to make it appear that the testator was entirely at fault.

Contestant sought to show that testator's son, Saul, took advantage of the situation and poisoned his father's mind against the contestant and unduly influenced him to make his will so as to cut her off with a comparatively small legacy.

The entire proof offered by contestant, in so far as it bears directly upon the issue of undue influence, is made by two sisters of the contestant and the daughter of one of them. And the evidence of these witnesses, in substance, is this: That the testator and some of his wife's relatives, in the presence of contestant, had a quarrel about the payment of some notes which it was claimed the testator owed; that Saul advised his father to pay the notes and then make a will leaving the wife so little that she would be compelled to go and live with her relatives, after testator's death, and that testator said that was good advice and he would follow it.

Contestant makes further proof by one of the same sisters that, on the day when testator went to see his lawyer to have his will drawn, he sat in his room studying some sheets of paper that looked like " letterheads," that Saul came to the door and called his father and asked him if he was ready to go to Harris' office (Harris being the lawyer who drew the will) and that testator went away with Saul, and, when he returned, he told contestant that he had made his will and that it was none of her business how he had made it; that she asked where the " papers " were and that he told her that Saul had them.

Contestant makes the further proof, again by one of her sisters, that, years after the will was made, at a time when testator himself was ill, he told his son, Saul, in substance, that he was not satisfied with the way he had treated his wife in his will, and that he wanted to change it, and that Saul said: " No, dad, you are not going to make another will, you've got one." This occurred in 1934, three years before he died and seven years after the will was made. It is at least doubtful that this last-mentioned evidence should have been received as bearing upon the subject of undue influence exercised at the time of making the will. (*Smith* v. *Keller*, 205 N. Y. 39, 47, 48, 49.)

All this evidence was disputed by proponents, but even if we accept it all as true, what have we more than a mere suspicion that Saul was guilty of exercising undue influence upon his father? The burden of proving undue influence is upon the contestant (*Matter of Kindberg*, 207 N. Y. 220, 228, 229), and while such influence may be shown by circumstantial evidence, " the circumstances must lead to it not only by a fair inference but as a necessary conclusion." (*Matter of Henderson*, 253 App. Div. 140, 145.)

The Court of Appeals has said: " A person has the right to use any reasonable and legitimate argument to induce another to make a will in any particular way. The giving of advice and the use of argument and persuasion do not constitute ground for avoiding a will made by a competent testatrix even if the will is made in conformity with the advice so given. A will cannot be avoided because of the influence of another, unless it appears that the influence exerted was so potent at the time the will was made as to take away and overcome the power of the

testatrix at that time to act freely and upon her own volition. The influence of another to avoid a will must amount to coercion and duress." (*Smith* v. *Keller*, *supra*, at p. 44.)

The lawyer who drew the will testified that no one came to his office with the testator the day the testator gave directions as to how he wanted the will drawn, and that no one came with him the day the will was executed. Saul testified that he never in his life had been in Harris' office. And contestant's sister only testified that Saul came for his father on the day testator first went to Harris' office.

It is undisputed by proof, or even inference, that, for ten years, the will was in the possession of testator, or in his safety deposit box and under his control. It is undisputed that testator was a strong-minded, hard-working, competent and successful business man, and so continued until shortly before his death. His will may not have been such as we would have made, but it was a perfectly natural one in view of the relations that existed between him and his wife, the contestant. All the proof of his feeling toward his wife only goes to show that undue influence was not needed to induce him to make his will as he did, and there is no proof clearly showing that Saul practiced any fraud to induce that feeling.

The decree, in so far as appealed from, should be reversed on the law and the facts, and the matter remitted to the surrogate with directions to enter a decree admitting the will to probate. (Surr. Ct. Act, § 309; *Matter of Burnham*, 234 N. Y. 475; *Matter of Streb*, 247 App. Div. 556.) Separate bills of costs should be allowed to executors-appellants and to appellant-special guardian, payable out of the estate. The appeal from the order becomes academic and should be dismissed, without costs.