In the Matter of the Accounting of HARVEY W. CHOLLAR et al., as Executors of SARAH V. CHOLLAR, Deceased.

Surrogate's Court, Broome County, October 9, 1951.

*Ray T. Hackett* and *John Harbachuk* for Harvey W. Chollar, objectant.

*John R. Normile* for Elma D. Huthison, respondent, and another.

PAGE, S. Deceased died a resident of Broome County on the 22d day of June, 1949, leaving a last will and testament which was duly admitted to probate on the 10th day of January, 1950. Thereupon, her brother, Harvey W. Chollar, of Stillwater, N. Y., and Earle W. Stone, former president of Binghamton Savings Bank, were appointed executors of her estate.

The first account herein was filed and the present proceeding instituted on the 3d day of November, 1950. Thereafter, and on the 28th day of May, 1951, a supplemental account was filed by said Earle W. Stone, as one of the said executors. This supplemental account consists of a proposed amendment of Schedule '' G '' of the original account by alleging, as additional assets of the estate of said deceased, proceeds of a savings bank account in the amount of $2,468.64 in the Binghamton Savings Bank and proceeds of another savings account in the amount of $888.32 in the City National Bank of Binghamton, N. Y., both of which, during the decedent's lifetime, had been withdrawn by said Harvey W. Chollar and deposited, in the names of himself and his wife, in the Troy Savings Bank of Troy, N. Y.

Objection to said supplemental or amended account was filed by said Harvey W. Chollar upon the ground that the amounts constituting the proceeds of said savings bank accounts, '' constituted valid gifts made by deceased during her lifetime to Harvey W. Chollar, individually.''

Deceased was a retired school teacher. At the date of the alleged gifts, she was upwards of seventy-five years of age and a member of the Home for Aged Women located at No. 80 Fairview Avenue, Binghamton, New York. The objectant, a retired Baptist minister, and his wife frequently visited her there. As testified herein by Mary Tabor Chollar, wife of the objectant, on one of these occasions, on the 28th of June, 1948, Sarah V. Chollar told the objectant herein that she wanted to give him her

savings bank accounts. As a part of some discussion between them as to this proposition, the objectant suggested to his sister Sarah that she might better not turn over her savings accounts to him. He told her that if, despite his advice, she insisted on doing so he would accept the proceeds of the accounts but would hold them intact in case she might, during her remaining lifetime, have need of financial assistance which he would provide for her therefrom. After sending for her bank books and intelligently resolving all the requirements necessary to consummate the transfers, the savings bank accounts were withdrawn as aforesaid.

Most frequently in discovery proceedings, and, also, as in the present case, upon judicial settlements, issues as to the existence or nonexistence of alleged gifts are presented for determination.

By analysis it is found that the complement of elements requisite as the basis for the determination of a gift are seven in number, viz.: (1) the subject matter of the alleged gift must be negotiable property in the sense that it is capable of legal transfer; (2) the donor must have been, at the time the gift was made, of sufficient mental competency to understand the nature and quality of his act in making the gift; (3) the donor must have, at such time, intended to make an absolute and complete present transfer to the donee of the subject matter of the gift; (4) delivery to the donee must have been legally perfected during the donor's lifetime; (5) there must have been an acceptance of the gift by the donee; (6) at the time of the gift, the donor must have been solvent, and (7) title to the subject matter of the gift must have been in the donor. (See 2 Bradford Butler on New York Surrogate Law and Practice, § 1466.)

It is scarcely possible to imagine a case .wherein more than two or three at the most of these elements could be seriously at issue. Ordinarily, the majority of them are readily inferred from circumstances indicative of some semblance of a gift that might or could amount to a tentative basis for claiming it.

In the present case, only two of the seven elements are questioned. The most unusual and interesting one of these is as to acceptance by the alleged donee. The other is as to the mental competency of the alleged donor at the date in question.

We will endeavor to dispose of the latter before taking up the former. In support of the contention that these bank accounts constitute assets of the estate, testimony by the attend-

ing physician at the Home as to the alleged donor's mentality was adduced. This testimony was generally to the effect that she was suffering from some degree of senile dementia, evidenced by her tendency to quickly forget recent events, and also by her striking at or otherwise resisting nurses at the Home in their ministrations designed for her physical welfare. The fact that, sometime after the date of the alleged gift, she was admitted to the Binghamton State Hospital was also shown by the evidence.

As is supported by other medical testimony, some degree of " senile dementia ", even though it may be only slight, is a fairly frequent condition among persons in their seventies. But, even in instances where the degree is fairly severe, the mentally afflicted person may have intermittent periods, sometimes referred to as " lucid intervals ", when he is sufficiently free from the condition so that he would be of a mentality capable of dealing with ordinary transactions.

By all of the testimony in the present case bearing upon this question, the decedent, as evidenced by her conduct of the transaction in question, was definitely clear-minded at the precise time in question. This is shown by her having given specific instructions as to locating the bank books and sending for withdrawal orders, executing the same and her having otherwise quite efficiently directed the entire matter. The fact that she " struck at " one of the nurses at the Home a day or two before the transaction in question is of little or no significance in its bearing upon the present issue. This is so because she was a member of the Christian Science faith and it was shown that she had resorted to a somewhat violent attitude toward nurses only at times when they were endeavoring to administer medicines to her which was contrary to her religious belief in that regard. Although this reaction on her part might not have been characteristic of all members of her religious faith, still we cannot say that, under these circumstances, it was unnatural or abnormal to a degree showing mental incompetency. As to her having been some weeks later admitted as a patient in the Binghamton State Hospital, based on this fact there can be no inference of mental incompetency on the date in question. Her having become a patient at the Binghamton State Hospital, whatever inference this event might support as to her subsequent mental state, has no bearing or effect upon her mental condition at the time of the transfers. Presumptions do not " run backwards ". (See dissenting opinion in *Smal-*

*done* v. *De Vivo*, 278 App. Div. 616, citing *MacRae* v. *Chelsea Fibre Mills*, 145 App. Div. 588.)

The other contention sought to be maintained on behalf of deceased's estate is that the objectant has failed to sustain his burden of proof in relation to the element of acceptance of the gift of the two bank accounts' proceeds because any otherwise possible inference of acceptance is negatived by the alleged donee's own words and actions.

The testimony in this regard relied upon by the coexecutor seeking to augment the assets of the estate by extending them to include the bank accounts is substantially as follows. (The testimony being by Mrs. Mary Chollar, wife of objectant.)

" Q. Do you remember Miss Chollar stating to Mr. Chollar that she was turning over these accounts to him as a gift? A. That's what she told him. She wanted to give them to him. He told her he would keep them if she ever needed them. He would not spend the money and if she ever needed them it would be there. But she said it was an outright gift to him. But he said he will not leave it that way.

" Q. Did Miss Chollar tell Mr. Chollar that she wanted him to use it for his own benefit? A. She spoke of a trip.

" Q. What did she say about that? A. ' I would like you to have a nice trip ', and he replied, ' I am not going to spend it. I am going to put it in the bank.' * * *

" Q. Do you recall whether or not anything was said by Miss Chollar that Mr. Chollar should take it and keep it in trust for her in case of an emergency? A. That's all his side. She said nothing of the kind. When he finally consented, he said, ' I will take it but I will not spend it for anything. If you ever need it, I will give it to you. It will be there in case of emergency.' "

In addition to the above-quoted testimony comprising a portion of the *res gestae* in connection with the transaction, there was also testimony by Mrs. Celia Wadin, assistant superintendent of the Home. This was to the effect that, some weeks after the date of the alleged gifts at a time when the superintendent and the attending physician at the Home were considering arrangements to have Miss Chollar transferred to another institution because of her mental deterioration, she was present at a conference with Mr. Chollar. During the course of this conference there was some discussion of the financial means of Miss Chollar in connection with which mention was made of the bank accounts in question. Her testimony was that Mr. Chollar, at that time, stated, " that he was holding in sacred

trust for his sister, the money, in case of emergency when she needed it."

The question, therefore, is as to whether acceptance of a potentially beneficial offer of a gift, all the other elements having been shown, is so deficient in respect to its requisite proof as to one of the requirements of demonstrating that a gift was made as to vitiate the theory of a gift by reason of the conceded fact that the recipient had the thought or intention in mind that he would defer employing it for his own personal benefit and never resort to any personal utilization of it unless or until he became finally assured that no need of the donor that money might supply would or could ever arise.

In order to reach a determination as to the legal bearing and effect of whatever aversion there was to the acceptance of the gift strictly as such, I think it is necessary to consider first whether or not there was any mutual arrangement, agreement or understanding between the alleged donor and donee as to the purpose and effect of the transfers. Although the circumstances, as shown by the evidence indicate that the alleged donee insisted upon some qualification of an outright gift, it would seem that the proper evaluation and effect to be given to such qualification must be determined upon a consideration of the circumstances as a whole rather than by resort to any single isolated remark of the alleged donee. For instance, referring to the time of the transfers, objectant's wife testified, "But she (the deceased) said it was an outright gift to him. But he said he will not leave it that way." This, by itself, indicates nonacceptance of these bank accounts in question as a gift. On the contrary, the same (above-quoted) testimony discloses an acceptance by its having been shown that the alleged donee said, "I will take it but I will not spend it for anything. If you ever need it I will *give* it to you." This indicates an intention to make a return gift and would imply that the transaction in question was intended by the transferee of the bank accounts as an immediate gift to himself but concerning which he had certain personal purposes and reservations in his mind.

As to his having, at a later date, made a remark to the superintendent of the Home to the effect that the money was being held by him " as a sacred trust ", while this might be some evidence as to what, as of the time of the transaction in question, his intent then had been, this would not necessarily be so. This transaction had occurred several weeks before and its bearing and effect upon one of the requisite elements of

proof supporting the existence of the gift claimed must be evaluated as of that time. If the original transaction demonstrates a completed gift as of that time, subsequent thoughts and intentions of the donee could not affect the legal situation in that regard. Moreover, the expression of " a trust " is to be taken and considered in a popular sense, such as would naturally be intended by a layman, rather than in any technical sense. In any event, there is no evidence indicative of any default in or breach of any self-imposed qualification or condition.

It is important to note that whatever qualification as to the consummation of a gift in relation to the requirement of acceptance could or might be inferred, was entirely on the part of the alleged donee. The alleged donor did not participate in this in any way. Of the two, it would seem that, in any such case as this, the attitude toward or conception of the purpose or purposes inherent in the transaction on the part of the donor would be of much more importance than that of the donee. As stated by the Court of Appeals in *Beaver* v. *Beaver* (117 N. Y. 421, 429): " The acceptance, also, may be implied when the gift, otherwise complete, is beneficial to the donee."

Since, in the present case, the alleged donor did not prescribe any qualification or condition, these having been suggested by the alleged donee only, we do not have quite the same situation as exists where there is shown to have been some qualifications or conditions stated by the transferor pursuant to which there had been an understanding or agreement that the transferee would hold the property turned over to him subject to some responsibility or duty having to do with prospective necessities of the transferor. But, even in cases where such an understanding is shown by uncontradicted and unimpeached testimony to have been the mutual agreement, and the death of the transferor has forever settled any and all question there could be as to the requisite observance of such conditions or qualifications, there would seem to be no good reason why the subject matter of the transfer, or remainder of it, should not be upheld as a gift to the transferee. If this be so, then, a fortiori, the principle would be applicable to a situation such as is presented herein.

Based on common experience it is to be inferred that this type of qualified transfer of property must be of very frequent occurrence. However, reported cases in New York involving questions as to the legal effect of such transfers are exceedingly rare. (*Matter of McCredy*, 72 N. Y. S. 2d 219 [1947], affd. 274

App. Div. 363) dealt with a situation where there had been a qualified transfer pursuant to which a gift was claimed. In that instance, decedent had turned over bank books to his nephew, stating, '' This is all I've got and you take care of me while I live and when I die I want you to bury me and what is left is yours when I am through.'' The bank account was held not an asset of decedent's estate, but the property of the nephew upon the theory of a gift *inter vivos*. As is shown by the text of American Jurisprudence (Vol. 24, Gifts, § 107, entitled, '' Effect of retaining control '',) cases of this character have been litigated in other States. Under the section referred to, after strongly stating that there can be no gift where any further control is retained by the transferor, the author goes on to say, '' On the other hand, special qualifications annexed to a gift causa mortis of savings bank deposits at the time the depositor's passbook is delivered do not affect its validity. Thus, where the donor, a few days before her death, directed the donee to unlock her trunk and take out her savings bank book, and then said to the donee, ' Keep this, and if anything happens to me, bury me decently and put a headstone over me, and anything that is left is yours,' it is a valid gift causa mortis; the special qualification annexed does not defeat it, but only couples the gift with the trust that the donee shall provide for the burial of the donor.'' Cases cited in support of this statement, exemplifying the principle in question, are: *Larrabee* v. *Hascall* (88 Me. 511) and *Curtis* v. *Portland Sav. Bank* (77 Me. 151). Whether the gift was one *causa mortis* or *inter vivos* would make no difference in regard to the element of acceptance.

The reason for requiring '' clear and convincing '' proof as to intent, delivery, acceptance or any other element of a gift, particularly in a case where the alleged donor has since died, is the prevention of an opportunity for the perpetration of fraud. But, in the present case, the credibility of the testimony as to the transaction is unquestioned.

Also, the propriety of determining the issue in favor of the gifts claimed is well corroborated by surrounding circumstances, chief among which was the lifelong close bond existing between the decedent and her brother and their habituated practice of exchanging or having property in common with each other. Another corroborative circumstance is that, as of the date of the transaction, the decedent had paid in several thousand dollars to the Home for which she held a contract for her lifelong maintenance there and was receiving a retired teacher's

pension ample for provision of her limited necessities otherwise than for her maintenance and support.

The conclusion follows that the proceeds of the bank accounts in question are not assets of the estate of the deceased and are the personal property of the objectant, Harvey W. Chollar in his individual capacity and the decree herein is to be settled accordingly.

Settle decree by agreement or upon notice.