Pauline L. HARRISON, Plaintiff,

v.

Ruth Harrison GROBE, Alfred C. Harrison, Jr., and Wilmington Trust Company, Defendants.

No. 90 Civ. 6456 (RLC).

United States District Court, S.D. New York.

April 20, 1992.

Chadbourne & Parke, New York City (Charles F. Gibbs, Thomas J. McCormack, of counsel), for plaintiff.

Morris, Nichols, Arsht & Tunnell, Wilmington, Del. (Thomas R. Hunt, Jr., Alan J. Stone, of counsel), Schulte Roth & Zabel, New York City (Irwin J. Sugarman, David J. Murray, of counsel), for defendants.

## OPINION

ROBERT L. CARTER, District Judge.

On May 2, 1990, plaintiff Pauline L. Harrison, then 72 years of age, had a cerebral infarction caused by a blood clot originating in the left atrium of her heart which travelled to the middle cerebral artery, obstructing the blood flow to the portion of the brain supplied by that artery and causing damage to the brain tissue, along with the accompanying neurological symptoms and signs. She was hospitalized until May 9. On a subsequent visit to her attending neurologist, Dr. Mark Horwich, the physician, warned of the possibility of a second stroke.

On June 6, 1990, plaintiff established an irrevocable trust which provided her with income from her assets for life and on her death divided her estate among her four children and Boyd deBrossard, her then soon-to-be husband. On June 12, she funded the trust by personally delivering 360,-000 shares of DuPont stock to her lawyers and signed an amendment to the trust which allowed for changes in the terms of the trust only on the unanimous consent of all the trustees. On June 20, 1990, she married Boyd deBrossard. On July 5, 1990, she and deBrossard visited her then lawyers, at a meeting that had been arranged a week before for the purpose of making a marital gift to deBrossard. At that meeting deBrossard learned for the first time about the trust. Plaintiff asserts that this was also the first time she knew that she had created an irrevocable trust and that she no longer was able to control and dispose of her assets without the consent of others.

Plaintiff now seeks to have the trust declared void, contending that she did not have the requisite capacity on June 6 or June 12 to create the trust; that she did not understand its terms; that she was under duress and undue influence when she executed the trust; and in any event the the terms of the trust are unconscionable.

The matter came on for trial to the court without a jury on January 21, 1992, and consumed four and a half trial days. The court observed and heard the testimony of all the principals in this controversy.[1] The

---

1. The testimony of deBrossard was presented to the court only by way of his deposition. deBrossard at the time of these events had been plaintiff's long time live-in companion, and became her husband on June 20, 1990. deBrossard, however, did not play an active role in the

threshold issue to be determined here is Harrison's ability to understand the nature of her action on June 6, 1990, when she signed the documents creating the irrevocable trust, and on June 12, 1990, when she signed an amendment to the trust requiring the unanimous approval of all trustees to effect any changes in any of the terms of the trust.

## DETERMINATION

Plaintiff asserts five theories under which she seeks to have the trust invalidated: (1) incapacity; (2) mistake, or that the trust was not the document she thought she was signing; (3) duress; (4) undue influence; and (5) unconscionability. We will deal with each claim seriatim.

### 1. *Incapacity*

■ Under New York law the settlor's legal capacity to execute the conveyance creating a trust is requisite to its validity. George Gleason Bogert, *Trust & Trustees*, § 44 (2d ed. 1984). Plaintiff and defendants differ as to the correct standard for determining whether a settlor had capacity to execute a trust. Plaintiff argues that the capacity test the court should use is that applied for contracts, citing *In re Estate of ACN*, 133 Misc.2d 1043, 509 N.Y.S.2d 966, 969 (Surr.Ct.1986). Defendants on the other hand claim that the proper test for capacity is that applied for testamentary instruments, citing *In re Estate of Gearin*, 132 A.D.2d 799, 517 N.Y.S.2d 339, 341 (3d Dept.1987). The court need not decide which standard applies, however, since under either standard Harrison had the requisite capacity to establish the trust.

■ The parties agree that the contractual standard for capacity is more exacting than the testamentary standard.[2] Accordingly, the court considers only the contractual standard, since if Harrison is deemed capable of establishing the trust under the contractual standard, she must necessarily meet the less demanding testamentary standard.

■ Contractual capacity is lacking where the contracting party (in this case the settlor) is " 'wholly and absolutely incompetent to comprehend and understand the nature of the transaction.' " *Ortelere v. Teacher's Retirement Board*, 25 N.Y.2d 196, 202, 303 N.Y.S.2d 362, 367, 250 N.E.2d 460, 464 (1969) (quoting *Aldrich v. Bailey*, 132 N.Y. 85, 89, 30 N.E. 264, 265 (1892)). *See also Wagner v. Wagner*, 156 A.D.2d 963, 549 N.Y.S.2d 256, 258 (4th Dep't.1989) ("the test is whether the party was so deprived of her mental faculties as to be wholly unable to comprehend the nature of the transaction"). Framed as a positive, instead of a negative, test, the critical inquiry is whether the party was capable of making "a rational judgment concerning the particular transaction." *Ortelere, supra*, 25 N.Y.2d at 203, 303, N.Y.S.2d at 367, 250 N.E.2d at 464.

■ "A party's competence is presumed and the party asserting incapacity has the burden of proving incompetence", *Feiden v. Feiden*, 151 A.D.2d 889, 542 N.Y.S.2d 860, 862 (3d Dept.1989) (citation omitted). Incapacity must be demonstrated at the time of the disputed transaction. *Id.* The cases demonstrate that under New York law that burden is an extremely heavy one.

In *Feiden v. Feiden, supra*, suit was brought to set aside an *inter vivos* land transfer because the grantor suffered from Alzheimer's disease. There was conflicting medical testimony concerning the grantor's mental capabilities. However, none of the medical testimony related to the grantor's mental acumen on the day of the transaction. The testimony concerning the day of

---

events of June 5, 6 and 12, 1990 which are central to the present dispute. Defendants seem to claim that deBrossard exercised duress and undue influence on plaintiff causing her to initiate this litigation. Determination of that question, however, is wholly peripheral to the issues presented in this controversy.

2. The contractual standard for capacity is discussed in detail below. The testamentary standard for capacity asks whether the settlor was aware of the "nature and extent of the property she was disposing of and the identity of those who would be considered the natural objects of her bounty." *In re Estate of Gearin*, 132 A.D.2d 799, 517 N.Y.S.2d 339, 341 (3d Dep't.1987).

the transaction indicated that the grantor knew what he was signing, was aware of who the beneficiary of the property was, and had the mental capacity to execute the deed. "[S]ince .... there was 'no direct proof that [the grantor] was not lucid, alert or oriented at the time of the transaction,'" the presumption of competency was not overturned. *Id.*, 542 N.Y.S.2d at 863.

A further review of the case law demonstrates that this rigorous standard is consistently applied. *See In re Ford's Estate*, 279 A.D. 152, 108 N.Y.S.2d 122 (1st Dep't. 1951) (fact that settlor suffered a stroke, leaving him bedridden three weeks before execution of the *inter-vivos* trust and two and one half months before execution of amendment to the trust did not alone sustain burden of evidencing settlor's incapacity.); *In re Chollar's Will*, 200 Misc. 948, 107 N.Y.S.2d 192 (Surr.Ct.1951) (even though her mental state was "diminishing" and she was committed to a mental hospital "some weeks after" the relevant transaction, donor was held to have had the requisite capacity to make an *inter-vivos* gift of a bank account. The court found her to have been "clear-minded" at the time of the conveyance.); *Broat v. Broat*, 18 N.Y.S.2d 709, 712, 713 (Sup.Ct.1940) (despite testimony that grantor was "childish" and "forgetful" and suffered from "senile deterioration," grantor held to have legal capacity to convey property by deed. "To avoid a deed under circumstances such as these, it is not enough to show that the grantor was old and feeble, that he had certain eccentricities, that he was forgetful and that his mental faculties were somewhat impaired. It must be shown that he was wholly, absolutely, and completely unable to understand or comprehend the nature of the transaction.").

■ We now apply this contractual standard of capacity to the facts of the instant case. In late May, 1990, Harrison had a telephone conversation with Craigh Leonard. Leonard is a member of the law firm of Richards & O'Neill, is plaintiff's godson, and was her legal advisor throughout the period relevant to this controversy. Harrison told him that she wanted to discuss management of her affairs in light of her stroke and he told her that he had been considering the feasibility of an *inter vivos* trust. (Tr. 241). She came to his office on June 5 with a yellow piece of paper from which she read. Jean Angell, Leonard's partner, later joined them. A draft of a proposed trust had been prepared. Harrison told Leonard she desired to provide for deBrossard and for her children, and that she wanted to make certain that neither her children nor deBrossard, in case of her incapacity, could alter the provisions she had made or amend them to defeat her beneficial intent. (Tr. 245–46). She was advised by both Leonard and Angell that the draft instrument being prepared provided for revocation only with the consent of the trustees. (Tr. 245). During this meeting Leonard learned for the first time that plaintiff's children and deBrossard were not getting along. (Tr. 243). Although he did not go over the document with her line by line, in the course of the June 5 meeting Leonard discussed the terms of the drafted *inter vivos* trust he had prepared.

Leonard agreed to become a trustee because Harrison wanted the instrument to become operative immediately (Tr. 256), but he told her he would only stay on as trustee for a short time and that the permanent trustees would be her daughter, Ruth, her son, Alfred, plaintiff herself, and the Wilmington Trust Co. (Tr. 245). Leonard advised the plaintiff that once she signed the document, any alterations required the consent of the trustees. (Tr. 249–50).

Harrison wanted to sign the documents creating the trust at once, but they were not ready for signature. Her concern was that she might suffer another stroke if effectuating the trust was delayed and that deBrossard's right to continue residing in her apartment might be at risk. She was told that the documents would be ready for signature the next day, June 6. (Tr. 294, 295, 299, 300, 321, 599).

The June 5 meeting is not recorded on either Leonard's time sheets nor on those of his partner, Jean Angell. (Tr. 259) However, Leonard's contemporaneous handwritten notes of what was discussed at that

meeting were made a part of the record. The document is entitled "Memo to Files re PLH" and is set out in full below:

(1) *Yellow pad* List of questions

(2) Spoke of tax consequences of marriage to Boyd. His request that he be given apartment now and that 120,000 shares of duPont be put in Fred Alger account. She says she doesn't want to do this. Spoke of need for asset management if she goes ga ga. Need to provide for Boyd in this period. She agrees it's necessary. Realizes children and Boyd do not really get along—so irrevocable. Need for speed—she's worried about going ga ga and going to dinner for the maker of RU486—told there may be violence at the meeting. Says Boyd wants: if remarried to be able to leave $ to his new wife/she doesn't agree. Wants to protect assets for her heirs.

Two paramount concerns (1) to provide reasonable (not lavish) amount for Boyd during her ga-ga ness and on her death-1/2 = enough. And (2) ensure that enough goes to her family. Realizes that *no child* will have 4,000,000 on her death and that Boyd asking for more. We discussed ante-nuptial agreement. Nothing if there is a divorce. He won't sign she says.

Plaintiff returned to Leonard's office the next afternoon. The documents were still being typed. While she was waiting, she was given a copy of the trust, and Leonard pointed out the significant provisions in the document and left her in his office with the copy for her to review while he finished working on other documents. When the documents being typed were ready, Leonard reviewed their provisions with her. She then signed the trust instrument itself (D. Ex. M), her will (D. Ex. N), a separate document entitled "AGREEMENT" assigning various assets to the trust irrevocably (D. Ex. O), a letter to Leonard stating that she had executed the trust agreement and awarded him power of attorney. The letter stated that her intention in executing the trust was to ensure that deBrossard and her children would share in the estate in accord with the terms of the trust agree-

ment in the event she became incapacitated, and she admonished the trustees in exercising their powers to keep in mind her objectives as expressed in the letter and further authorized Leonard to make any additional assignment of assets to the trust if it could be done without undue difficulty. (D. Ex. P). The effect of all of this was to provide income to Harrison from the trust during her life and to dispose of her assets on death in accord with her current will, executed on March 9, 1990. The named trustees in the June 6 instrument were plaintiff, Leonard and the Wilmington Trust Co., but Leonard's trustee status was only temporary since he intended to step down, at which point Alfred and Ruth would become trustees.

Leonard, Angell and Nancy Niedt, an associate in the firm, who drafted some of the trust documents, and Elaine Barry, Leonard's secretary are the only court witnesses to Harrison's demeanor, appearance and attitude on June 5 and June 6. They testified that she appeared to understand everything that was going on, that they were certain that she had testamentary capacity (Leonard Tr. 304, 335; Angell Tr. 606; Niedt Tr. 183; Barry Tr. 763), and that she understood the nature of the documents she was signing and the consequences of signing them (Leonard Tr. 304; Angell Tr. 607). Angell testified that "we explained the substantive terms of the instrument to her. We reviewed the substantive terms [of] the instruments on June 5, and we reviewed [them] again with her on June sixth, before she signed the documents." Based on her prior experience with plaintiff and her demeanor, Angell stated that plaintiff appeared to understand what was happening. (Tr. 607).

After signing all the documents, Harrison promised to call Leonard the next day to arrange for him to meet her on Friday, June 8 at the Bank of New York so that he could take custody of the DuPont certificates and arrange for delivery of the stock to the Wilmington Trust Co. She did not call Leonard and had not otherwise taken care of this detail by June 11, when he went on vacation.

On June 12, Angell spoke to plaintiff's daughter, Ruth, about another matter. In the course of that conversation Angell advised Ruth that her mother had not transferred custody of the DuPont stock to the Wilmington Trust Co. Ruth asked Angell to call Harrison. Angell called but received a negative response from Harrison. Angell called Ruth to report this conversation. Ruth then called her mother urging her to place the stock certificates in the trust. Ruth testified that she told her mother she was terribly worried about the trust not being fully funded; that her mother knew Ruth felt that by marrying deBrossard she was committing a self-destructive act and that she had to protect herself; that if she did not want Ruth to be worried and anxious, to be happy, to come to the mother's forthcoming wedding and to continue to be nice to deBrossard, plaintiff had to take care of this matter of funding the trust. Her mother spoke first of putting half the assets in the trust. Ruth urged her to put all of the DuPont certificates in the trust.

As a result, Harrison brought the certificates to Angell that afternoon, and while at the office signed an amendment to the trust requiring all modifications of the trust be pursuant to the unanimous consent of all the trustees—an amendment requested by the Wilmington Trust Co.

Harrison testified that she had no recollection whatever of this June 5 meeting, and seeks to create further doubt that the meeting ever took place, noting that she did not use limousine services that day, that there is no record of her signing the visitors' roster in the lawyers' office, and that there is no listing of June 5 on the time sheets of either Angell or Leonard. But these observations are not dispositive of what happened on June 5. Harrison did not always use limousine services because of the expense; she often used taxis and, when accompanied by deBrossard, even public transportation. Nor did Harrison always sign the visitors' log when visiting the law office. Angell and Leonard were not prompt recorders of the time sheets and Leonard says he might have merged June 5 and 6 on his time records. Further,

Leonard made a memorandum of the June 5 meeting.

Moreover, Leonard's and Angell's testimony appears to be that of totally disinterested witnesses. Leonard and Angell do not appear to have a motive to lie. They are not beneficiaries of the trust. While Leonard was temporarily a trustee, he resigned early on to allow Alfred and Ruth to become trustees. In addition, not only does the trust not benefit Leonard, but as the executor of Harrison's March 9, 1990 will, he stood to earn an executor's fee (not an insignificant sum for assets of approximately $18 million). The trust eliminated his role as executor, so that it has deprived him of this prospective fee.

I credit the testimony of Leonard and Angell and conclude that the meeting took place as described by them; that Harrison requested that they prepare an irrevocable trust for her signature; that Harrison understood and knew precisely what she was doing on June 5 when she requested Leonard and Angell to prepare documents for a testamentary disposition of her property to provide income to herself for life and on her death to dispose of it in accord with her March 9, 1990 will to her children and to deBrossard; and that it was her intent that the disposition be irrevocable except on consent of the trustees. She also knew on June 5 that the reason Leonard became a trustee was because she wanted the matter to be effective immediately. On his resignation, it was her desire that two of her children, Alfred and Ruth, were to become trustees.

In light of Harrison's recollection of other events on June 6, 1990, her testimony that she has no recollection of signing the trust documents on that day is simply not to be believed. She recalls giving a speech on June 6 introducing Dr. Beaulieu, who invented the pill RU 486, to the New York State Republican Family Committee (Tr. 394), and that the speech went well. She also recalls visiting her neurologist that same day. Yet, she professes to have no recollection of the meeting with Leonard and Angell or of executing the trust. Either her memory is being selective, as sug-

gested by defendants' experts in aphasiology, or the claimed lack of recollection is a mere contrivance. In either case, the court finds that she had the requisite legal capacity on June 6 to understand and execute the documents establishing the trust.

On June 12, Harrison signed an amendment to the trust providing that any modification required the unanimous consent of all the trustees and turned over to Angell 360,000 shares of DuPont stock to fund the trust. Angell testified that she was alert and aware on June 12 and counted the shares of stock correctly when Angell had miscounted them. Harrison's testimony about this occasion is conflicting. She testified on the one hand that she signed a sheet of paper because Angell told her to sign it but did not explain it to her, and that she did not know she was signing anything involving a trust. On the other hand Harrison says she thought she was making arrangements of her property for the short term in the event she had another stroke and did not realize that she could not regain control of her property when she recovered.

The testimony is confusing and makes little sense, despite the fact that Harrison certainly appears to be a very intelligent woman. She must know that at her age the doctor's concern about the possibility of a second stroke is a concern she must face for the rest of her life. Her full recovery from this stroke does not mean that she is no longer vulnerable to a second seizure. Indeed, when her neurologist voiced the possibility of another stroke, she was already well on her way to full recovery from the first one.

Harrison must have realized in June when she decided to place her property in trust that she was making a permanent arrangement to have her property settled as she wished in the event of a second stroke. She in effect virtually admitted on the witness stand that that is what she did and that was her intent. She testified that she was concerned that the children would not provide for deBrossard and wanted to make sure that any provision made for him could not be taken away by the children and that he could not take away from the children anything she wanted them to have. (Tr. 416–17). This was something she felt the need to take care of. (Tr. 416).

Harrison contends that her stroke resulted in comprehension problems that deprived her of capacity to execute the trust. However, the record is totally devoid of any credible evidence that Harrison suffered such comprehension problems at any time during her hospitalization and convalescence from her stroke. She remembers the onslaught of the stroke and going to the hospital in an ambulance. There is no indication in her hospital records of her having comprehension problems. Harrison's children saw her in May and she exhibited no comprehension problems. She recalls that she remained hospitalized until May 9. She recalls that three of her children—Alison, Henry and Ruth—visited her in the hospital, along with Alison's husband Charles Gill, a granddaughter, Katherine Ross, her father, Gordon Ross who came to pick his daughter up, and deBrossard. (Tr. 392). On her release from the hospital she remembers that her son Alfred stayed with her in her apartment. She recalls visiting her treating neurologist, Dr. Mark Horwich, on May 18. (Tr. 393). She also recalls taking the results of an MRI test with her to the doctor's office. (Tr. 392). Her treating physician saw no evidence of comprehension difficulty, and defendants' aphasiologists could find no evidence in the record of comprehension problems.

Harrison remembers playing in a duplicate bridge game at the Regency Club with deBrossard on May 23 and winning. (Tr. 399). To play bridge well, particularly duplicate or tournament bridge, requires concentration and alertness.

Horwich testified that the major effect of the May 2 stroke was aphasia (Tr. 27); that Harrison had difficulty with her speech but could follow simple instructions; that she was easily fatigued both mentally and physically; and that depression in cases of this kind is commonplace. (Tr. 37). Horwich testified that Harrison did not demonstrate any symptoms of posterior aphasia, the posterior area of the brain being the

area thought to control comprehension. (Tr. 51). On a visit to Horwich's office on May 18, Harrison's son Alfred reported that his mother's comprehension appeared to be intact. (Tr. 40). Horwich saw plaintiff on June 6, the date the trust was executed. He observed that she seemed to be improving. Harrison reported that she was reading without difficulty and was able to repeat phrases with ease. (Tr. 41). She appeared normal in all respects to the doctor on the June 6 visit, except for an occasional pause when speaking. (Tr. 55). Her comprehension appeared good from May 3 throughout her hospital stay, and there are no hospital notations indicating that she was having comprehension problems.

Ann Hickerson, a speech pathologist who works with neurologically impaired patients, began seeing Harrison at the latter's apartment beginning on May 14. She testified about her hour-long sessions with the plaintiff on May 14, 15, 21, June 1, 8, 29 and July 29. (Tr. 72). Hickerson viewed Harrison's difficulty in speech as related not only to motor production but to comprehension as well. However, none of the tests she gave Harrison tested cognitive ability. (Tr. 117). Harrison gave correct answers to 7 of 8 questions on a Boston Diagnostic Aphasia Examination, Complex Ideation Question Subtest and correct answers to 11 of 12 questions on the Schuell Reading Sentence Comprehension Test. (Tr. 119). In the May 21 session Harrison did very well with a bridge game in the New York Times (Tr. 86); Harrison later read a speech to Hickerson which she planned to present on June 6 (Tr. 87), and on June 8 Hickerson was told that the speech went well. (Tr. 88). At her June 1 session Harrison could shift more easily from one topic to another and hold a variety of ideas in her mind at once, which was to Hickerson an indication of improvement in comprehension. (Tr. 122). Hickerson's notes of the June 29 session indicate that Harrison told her of her remarriage and that she had resumed playing tournament bridge. (Tr. 92–3).

Hickerson's was the only testimony to the effect that Harrison was having comprehension problems. Hickerson testified that Harrison could not have understood the trust documents since she, the therapist, did not understand the documents. Hickerson's testimony carries no weight. The fact that Harrison might not understand every line in a series of voluminous documents involving the establishment of a trust is no indication that she did not understand the more general import of those documents. The issue here is not whether Harrison understood every word of the trust documents, but rather whether she instructed the lawyers to prepare the trust instrument, whether they followed her instructions and explained the meaning of the technical language which they had to use in the instrument, and whether she was satisfied that what she wished to accomplish had been realized. An attempt to establish Harrison's lack of understanding of the trust instrument through this kind of testimony is, in the court's view, both a waste of time and unprofessional.

Hickerson also appears to have misinterpreted Harrison's speech difficulty as relating to comprehension. Hickerson has no expertise in aphasia. Both of defendants' experts—Dr. Jason Brown, a neurologist and aphasiologist with impeccable credentials, and Dr. Robert Goldfarb, a licensed speech pathologist specializing in aphasia and related language disorders of adults—questioned her competence. Hickerson did not provide the correct test to determine Harrison's cognitive ability, and the test she did give Harrison showed her functioning at a high level of comprehension. Moreover, Hickerson was not present with the plaintiff on June 5, 6 or 12 when she instructed her lawyers as to her desires and intention, when the documents establishing the trust were explained to her, and when she signed the various documents, including a letter which in clear non-technical language sets forth Harrison's intentions in establishing the trust.

Brown and Goldfarb testified that Harrison's performance as reflected in Hickerson's notes—performance on the tests administered, ability to play bridge well, ability to shift from one topic to another and to

hold a variety of ideas in mind—were indices of good comprehension. (Tr. 519, 586, 720). According to Brown, her performance on the tests was astonishingly good and more than satisfies the requirements for understanding. (Tr. 587). Goldfarb was of the view that Hickerson's testimony concerning Harrison's cognitive difficulties should be discounted in that she was in no position to evaluate Harrison's powers of comprehension professionally since Hickerson administered no tests designed for measurement of that capacity (Tr. 719–20), and he stated that Harrison was very lucky to have had a stroke and yet retain such communicative competence. (Tr. 711).

Harrison spent time with her children after her release, and they all indicated that she showed no loss of comprehension. On May 10, she had lunch with Ruth and told Ruth of her decision to marry deBrossard. Ruth urged her mother to wait. (Tr. 778). During a subsequent telephone conversation later in May, when her mother again announced her intention to marry deBrossard, Ruth suggested she take steps to protect herself by entering into a prenuptial agreement. Harrison said she would talk to Craigh Leonard, her lawyer. Harrison spent the Memorial Day weekend in Connecticut with her children and announced her intention to marry deBrossard. The children did not approve and tried to talk her out of it without success. The marriage took place on June 20.

Alfred came in from San Francisco on May 15 and stayed with his mother for a week. He accompanied her to the doctor on May 18, dined with her in various restaurants in the city, and visited a number of art galleries with her. His mother was functioning quite well throughout his stay in New York according to the son. Alfred runs an art gallery in San Francisco, and he testified that because of his mother's insistence, he bought for his gallery a series of modern paintings that he was reluctant to buy, noting however that his gallery has profited from his bowing to his mother's advice. She exhibited the same strong will during his visit that he was accustomed to seeing in her. (Tr. 452, 471, 481–82). Harrison remembers visiting the art galleries with her son. (Tr. 396).

The evidence in this record shows that Harrison's stroke did not interfere with her cognitive abilities in any way, and the only people who saw her on the critical days in question—June 5, 6, and 12—unanimously agreed that she exhibited the requisite legal competence to execute the documents she signed on June 6 and 12. In light of their testimony, and in view of the lack of credible testimony establishing, to the degree of certainty required by the law, that Harrison was " 'wholly and absolutely incompetent to comprehend and understand the nature of the transaction,' " *Ortelere, supra,* 25 N.Y.2d at 202, 303 N.Y.S.2d at 367, 250 N.E.2d at 464, the court finds that Harrison was capable of executing the trust on June 6 and of amending it on June 12.

### 2. *Mistake*

■■ Harrison's second argument is that she was mistaken as to the nature of the instrument she signed. An irrevocable trust may be rescinded "upon proof of the settlor's misunderstanding of the nature of the instrument." *Kreindler v. Irving Trust Co.,* 26 A.D.2d 746, 272 N.Y.S.2d 202, 204 (3d Dep't.1966); *accord Barnard v. Gantz,* 140 N.Y. 249, 35 N.E. 430 (1893). The party seeking revocation or rescission has the burden of proving mistake by a "clear showing." *Kreindler, supra,* 272 N.Y.S.2d at 204. Whether the settlor was mistaken as to the legal effect of the instrument signed is governed by the facts.

In this case it is difficult for me to credit Harrison's testimony. She admits in effect that she knew she was signing a trust instrument but did not know it was irrevocable. I cannot credit that disclaimer. Leonard's testimony that she came to his office on June 5 with a yellow sheet of paper outlining what she wanted done is altogether convincing, and this testimony is further buttressed by a contemporaneous memorandum itemizing what was discussed at the June 5 session. I credit and accept his and Angell's testimony as to what occurred on June 5, 6 and 12.

Harrison had more knowledge and understanding about what a trust was and how one operates than the average non-professional. She was beneficiary of a trust established by her father and was in frequent contact with her lawyers in planning the disposition of her property. While professing lack of present recollection of requesting her lawyers to establish a trust on June 5 and executing the instrument on June 6, on cross examination Harrison conceded that she was concerned that in the event of her death or incapacity, her children might not provide for deBrossard in the fashion she would have deemed appropriate. She admitted wanting to make sure that any provisions she made for deBrossard would be secure against attempts by her children to deprive him of them. She also agreed that she wanted to make sure that deBrossard could not undo any provisions she made for her children. These were matters she needed to take care of and provide for. (Tr. 416–17). These admissions are entirely consistent with what Leonard testified as being the central theme of the conversation that he had with Harrison on June 5. The irrevocable nature of the trust instrument was explained to her during the discussion of June 5 and again before she executed the various documents creating the trust on June 6.

There is other evidence in the record that Harrison executed this trust with full knowledge of what she was doing. On May 21, while visiting with Harrison during her convalescence from her stroke, Harrison's son Alfred suggested that it would be a good idea to create a trust "or some such thing that would direct us if you were to have another stroke." Harrison agreed it was a good idea and said she would call Leonard. (Tr. 460). She called Leonard the last week in May and agreed to come to Leonard's office on June 5. After Alfred returned to California, his mother called him, told him she had created a trust, that Leonard had become a trustee as a matter of convenience, that on Leonard's resignation he and his sister Ruth were to become successor trustees, and that he was not to say anything about the trust to deBrossard. (Tr. 459–60). After

she came home from the hospital, Harrison told Edith Kelly, who provides bookkeeping services for Harrison's household accounts, that she was worried that she might have another stroke and that she had drawn up an agreement for such an eventuality so that Alfred and Ruth could sign for her. (Tr. 149–50).

As to the signing of the June 12 amendment requiring unanimous consent of all the trustees, her testimony is ambiguous and conflicting. There is no doubt in the court's mind that she knew exactly what was in the June 12 amendment and that Angell explained it to her.

In sum, there is no clear showing on this record that Harrison misunderstood the nature of the instruments she signed on June 6 and June 12. Indeed the record fully supports a finding to the contrary—that she knew precisely the purport and implications of the documents she executed on the days in question. Accordingly, there is no basis for rescission or revocation of the trust agreement on the basis of Harrison's misunderstanding.

### 3. *Duress*

■ Plaintiff's next argument for the invalidation of the trust is that it was executed under duress, but she has failed to present any evidence on this score. Duress is shown where "one is compelled to perform an act which he has a legal right to abstain from performing. The compulsion must be such as to overcome the exercise of freewill. It must 'involve an act or threat of action from which the person sought to be influenced is entitled to be free.' A threat to do that which one has a right to do does not constitute duress." *Gerstein v. 532 Broad Hollow Road Co.*, 75 A.D.2d 292, 429 N.Y.S.2d 195, 199 (1st Dep't.1980) (quoting *Kazaras v. Manufacturers Trust Co.*, 4 A.D.2d 227, 237, 164 N.Y.S.2d 211, 220 (1st Dep't.1957) (internal citations omitted).

■ It is difficult for the court to come to grips with this argument. Harrison's children or Leonard must have been the source of the duress of which plaintiff com-

plains. Nothing in evidence suggests that Leonard put plaintiff under any duress. Although Leonard was plaintiff's godson, there is nothing in the record to show his functioning in relation to the matters before the court in other than a professional capacity. It has already been established that he receives no benefit from the trust. Further, since plaintiff claims to have no memory of June 5 or 6, she cannot argue that she was the victim of duress from Leonard. Therefore, there is nothing in the record produced by plaintiff to establish that the alleged duress originated with him.

There is also no proof that the children were a source of duress. The children had no knowledge of the terms of the trust until after its execution. There is evidence that both Alfred and Ruth suggested to their mother that she establish a trust or similar document. On May 21, 1990, in the course of a conversation about a tax problem his mother had asked him to discuss with Craigh Leonard, Alfred raised with Leonard the concept of a trust for Harrison. (Tr. 461). After that conversation Alfred suggested to his mother that she consider setting up a trust or some vehicle for directing people what to do in the event of a second stroke. There is also evidence that Ruth called her mother on June 12 to urge and insist that she fund the trust by turning over her DuPont stock to Angell so it could be deposited with the Wilmington Trust Co. That conversation was heated and emotional but nevertheless lacks the legal requisites of duress. Moreover, plaintiff recalls no conversation with any of her children in May or June, 1990, about the trust or, with the exception of Ruth, about delivering the DuPont stock to her lawyers. (Tr. 416).

There is nothing on this record to show that Ruth, Alfred, or any of the defendants acted or threatened action from which Harrison had a legal right to be free. Children are free to talk to a parent and to try to persuade a parent to take action they deem to be in the parent's best interest. The persuasion can be intense, emotional and pressured, as was Ruth's conversation with her mother on June 12, 1990, but this still falls far short of duress within the meaning of New York law. *See Kazaras v. Manufacturers Trust Co.*, *supra*, (father threatened to disinherit daughter if she did not put her assets in trust, since father disliked and mistrusted daughter's new husband. Court held this was not duress since father had every right to withhold his money from daughter, and thus his conditional threat to do so was not wrongful.); *Smith v. Jones*, 76 Misc.2d 656, 351 N.Y.S.2d 802 (Civ.Ct., N.Y.Cty.1973) (husband sought to rescind a separation agreement on grounds of duress, claiming that he signed the agreement because of fear that his wife would otherwise publicize his homosexuality. Court held that since wife had every legal right to do just what he feared, there was no wrongful act upon which to base a claim of duress.). Accordingly, no showing of duress has been made out on these facts, and the trust cannot be invalidated on this ground.

### 4. Undue Influence

Plaintiff's claim of undue influence fares no better. One asserting undue influence must show "that the influence exercised amounted to moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the [victim] to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist." *In re Estate of Bush*, 85 A.D.2d 887, 446 N.Y.S.2d 759, 761 (4th Dep't.1981) (citations omitted).

Under New York law undue influence may be established by direct or circumstantial evidence, but the "circumstances must lead to it not only by fair inference but as a necessary conclusion. To avoid a [trust] of a competent [settlor] on the grounds of undue influence, the contestant must show facts entirely inconsistent with the execution of the [trust] by any means other than undue influence." *Matter of Henderson*, 253 A.D. 140, 145, 1 N.Y.S.2d 871, 875 (4th Dep't.1937) (discussing undue influence in wills context). Fur-

ther, "no inference of undue influence may be drawn from the fact that proponents [of a trust] had the opportunity and motive [to unduly influence the settlor], absent evidence that such influence was actually utilized." *In re Estate of Bush, supra,* 446 N.Y.S.2d at 761 (citations omitted); *accord In re Estate of Gearin, supra,* 517 N.Y.S.2d at 341.

▌ Factors considered relevant in determining whether undue influence controlled the settlor in the creation of a trust include: (1) whether a trustee, beneficiary or a third party persuaded the settlor to create the trust; (2) the improvidence of the settlor in creating the trust; (3) whether the settlor had independent legal advice; (4) the age, health, business competence and intelligence of the settlor; and (5) whether it could be natural for a person in the position of the settlor to create such a trust when not under the undue influence of third parties. *Restatement (Second) of Trust,* § 333, Comment C (1939).

▌ While the general rule is that the party seeking to avoid a trust has the burden of proving undue influence, *In re Estate of Gearin, supra,* 517 N.Y.S.2d at 341, under the doctrine of constructive fraud, the burden may be shifted to the party defending the trust if the particular facts give rise to a suspicion that undue influence was exerted. *In re McGlone's Will,* 258 A.D. 596, 598, 17 N.Y.S.2d 316, 319 (2d Dep't.), *rev'd on other grounds,* 284 N.Y. 527, 32 N.E.2d 539 (1940); *In re Rogers' Will,* 250 A.D. 26, 293 N.Y.S. 626 (2d Dep't. 1937); *In re Moore's Will,* 53 Misc.2d 786, 41 N.Y.S.2d 697, 701–03 (Surr.Ct.1943).

▌ Such a suspicion may arise where a confidential or fiduciary relationship existed between the settlor and the person who benefits from the trust, such as the relationship of parent and child, husband and wife, guardian and ward, *cestui que trust* and trustee, and other similarly close relationships. *See In re Moore's Will, supra,* 41 N.Y.S.2d at 702–03. However, no presumption of undue influence arises merely from the relationships cited, without more. Instead, it is only when "it appears prima facie that the parties have

been dealing with each other under circumstances of inequality [that] a presumption arises as against the [controlling party], especially if the transaction has resulted in detriment to the [settlor]" *In re Rogers' Will, supra,* 293 N.Y.S. at 630 (discussing husband-wife relationship).

▌ The law of New York on this issue was stated by the Court of Appeals in *In the Matter of the Will of Smith,* 95 N.Y. 516 (1884), and the case law has not changed since. In *Smith* the court stated:

Undue influence, which is a species of fraud, when relied upon to annul a transaction *inter partes,* or a testamentary disposition, *must be proved and cannot be presumed.* But the relation in which the parties in a transaction stand to each other, is often a material circumstance and may of itself in some cases be sufficient to raise a presumption of its existence. Transactions between guardian and ward, attorney and client, trustee and *cestui que trust,* or persons one of whom is dependent upon and subject to the control of the other, are illustrations of this doctrine. Dealings between parties thus situated, *resulting in a benefit conferred upon, or an advantage gained by the one holding the dominating situation,* naturally excite suspicion, and when the situation is shown, then there is cast upon the party claiming the benefit or advantage, the burden of relieving himself from the suspicion thus engendered, and of showing either by direct proof or by circumstances that the transaction was free from fraud or undue influence, and that the other party acted without restraint and under no coercion, or any pressure direct or indirect, of the party benefited. This rule does not proceed upon a presumption of invalidity of the particular transaction, without proof. *The proof is made in the first instance when the relation and the personal intervention of the party claiming the benefit, is shown.* The law is not so impracticable as to refuse to take notice of the influence of greed and selfishness upon human conduct, and in the case supposed it wisely interposes by

adjusting by quality and measure of proof to the circumstances, to protect the weaker party and, as far as may be, to make it certain that trust and confidence have not been perverted or abused. * * * [T]he fact that the beneficiary was the guardian, attorney or trustee * * * does not alone create a presumption against a testamentary gift or that it was procured by undue influence * * * But taking all the circumstances together—the fiduciary relation, the change of testamentary intention, the age, and the mental and physical condition of the [settlor], the fact that the proponent was the draftsman and principal beneficiary * * * and took an active part in procuring * * * execution [of the instrument] and that the [settlor] acted without independent advice, a case was made which required explanation, and which imposed on the proponent the burden of satisfying the court that the [transaction] was the free, untrammelled and intelligent expression of the wishes and intention of the [settlor].

95 N.Y. at 522–23 (citations omitted) (emphasis supplied). Thus, in order to shift the burden of proof to the defendants, plaintiff must do more than simply show the existence of one of the suspect relationships between herself and defendants. Plaintiff must also show that the defendants benefited from the trust and demonstrate "the personal intervention of the party claiming the benefit," *id.*, or that they "dealt with [her] under circumstances of inequality" in the creation of the trust. *In re Rogers' Will, supra,* 293 N.Y.S. at 630.

Plaintiff cites *Barnard v. Gantz, supra; Hayes v. Union Trust Co. of New York,* 27 Misc. 240, 57 N.Y.S. 801 (Sup.Ct.1899); and *Gibbes v. New York Life Insurance and Trust Co.,* 67 How.Pr. 207 (Sup.Ct.1883), for the proposition that the mere existence of a confidential relationship such as between herself and her children or herself and Leonard is sufficient without more to shift to defendants the burden of showing that creation of the trust was done knowingly, voluntarily, and free from any undue influence. That is not my understanding

of the law of New York, nor the import of the cases relied upon by plaintiff. In *Barnard, supra,* it was the settlor's advanced age at the time the trust was created and the fact that she was being advised by her son-in-law, who was a trustee and beneficiary of the trust, that raised questions of undue influence. Where fiduciary relationships exist and one of the parties is dependent upon or subject to the control of the other, suspicion arises when the dominant party in dealing with the dependent party gains a benefit or advantage. *Id.* In *Hayes* and *Gibbes* fiduciaries and close relatives also used their influence to benefit themselves to the grantor's detriment.

In this case Harrison claims that she was the victim of undue influence from two sources, namely her children and Leonard. With respect to her children, Harrison has failed to make out the prima facie case required to shift to them the burden of disproving undue influence. It is true that Alfred and Ruth are the beneficiaries of the trust, and that each of them suggested to Harrison that she create a trust. However, there is no evidence that either of them dealt on unequal terms with Harrison or exercised improper influence over her decision to execute the trust. Therefore the burden of proving undue influence remains with plaintiff with respect to her children. The court finds that she has failed to carry this burden.

Plaintiff has also failed to make out the prima facie case required to shift the burden of proof to Leonard on the issue of undue influence. Leonard was Harrison's attorney, but there is no evidence that Leonard benefited from the creation of the trust in any way. Instead, he gave up a probable future financial gain. Therefore the burden of proof remains with plaintiff with respect to Leonard, also. There is no evidence that Leonard violated any fiduciary obligation in connection with the creation of the trust. Under these circumstances, plaintiff has failed to provide proof that either the children or Leonard exercised undue influence upon her, causing her to establish the trust.

As noted above, plaintiff argues for a different interpretation of New York law on the issue of burden shifting where undue influence is claimed. Plaintiff asserts that whenever there is an attorney/client or *cestui que trust*/trustee relationship between those that benefit from the trust and the settlor, the burden is always shifted to the defenders of the trust, citing *Barnard v. Gantz*, 140 N.Y. 249, 35 N.E. 430 (1893); *In the Matter of the Will of Smith, supra*, 95 N.Y. 516; *Cowee v. Cornell*, 75 N.Y. 91, 99–101 (1978); *Hayes v. Union Trust Co. of New York*, 27 Misc. 240, 57 N.Y.S. 801 (Sup.Ct.1899); and *Gibbes v. New York Life Insurance and Trust Co.*, 67 How.Pr. 207 (Sup.Ct.1883).

 However, even applying plaintiff's rule *arguendo*, the burden of proof remains with plaintiff both with respect to her children and Leonard. While Harrison was in a *cestui que trust*/trustee relationship with her children, a relationship that under plaintiff's view would *per se* shift the burden of proof to defendants, that relationship only began with the creation of the trust in question. The suspicion of undue influence that flows from the fiduciary relationship of trustee and trust beneficiary does not exist until the trust is executed. Therefore, the relationship between Harrison and her children must be considered simply that of parent and child for the purposes of the burden-shifting rule. Plaintiff's own cases make clear, however, that the burden does not shift to defendants without more where the relationship is merely that of parent and child. *See Cowee, supra*, 75 N.Y. at 101. Without the *per se* burden shifting, plaintiff must show some evidence of unequal dealing or coercion before the burden will be shifted to the defenders of the trust to show an absence of undue influence. *In re Rogers' Will, supra*, 293 N.Y.S. at 630; *see also Feiden, supra*, 542 N.Y.S.2d at 863 (existence of a family relationship is not sufficient to show undue influence; there must be other facts or circumstances showing inequality or controlling influence.).

Likewise with respect to Harrison's claim that Leonard subjected her to undue influence, even if the court applies plaintiff's view of New York law, the burden of proof remains with plaintiff. Leonard and Harrison were clearly in an attorney-client relationship, which plaintiff argues should shift the burden of proof to Leonard. Once again, however, plaintiff's own cases make clear that this rule is inapplicable here. The burden shifts only where the transaction in question "result[s] in a benefit conferred upon, or an advantage gained by the one holding the dominant situation." *In the Matter of the Will of Smith, supra*, 95 N.Y. at 522. As observed above, the evidence in this case establishes that Leonard gained no benefit from the creation of the trust, and that in fact he forfeited the chance of earning a potentially substantial executor's fee. Under these circumstances, plaintiff's burden-shifting rule does not apply, and the burden of proof remains on plaintiff.

 Finally, even if the burden of proof were shifted to defendants in this case, requiring them to demonstrate the absence of any exercise of undue influence on their parts in order to sustain the validity of the trust, the court finds that defendants have sustained their burden. As discussed above, there is no evidence of improper influence having been applied to Harrison by Alfred, Ruth, or Leonard. Moreover, there is convincing evidence that Harrison herself proposed the terms of the trust and was impatient to have it executed as quickly as possible. Thus, under both the view of New York law adopted by the court and that urged by plaintiff, the court rules that no undue influence tainted the creation of the trust in question.

### 5. *Unconscionability*

 As to Harrison's final claim, the unconscionability of the trust, there has been absolutely nothing put forward to support this claim. Harrison is provided for for life under the terms of the trust. The only change in her position after the trust was established is that she can no longer take unilateral action concerning the property governed by the trust. The unanimous consent of the other trustees will be

required. Since this is what she wished and asked her lawyers to accomplish through the trust documents, she is in no position to claim unconscionability. Accordingly, that claim must be dismissed as unproved.

## CONCLUSION

For all the reasons stated, the court concludes that plaintiff had legal capacity to execute the trust instruments on June 6 and the amendments she authorized on June 12. She was fully aware on those days of what she was doing, of the extent and nature of her property and of the natural objects of her bounty. She felt vulnerable because of the doctor's warning of the possibility of a second stroke. She wanted to be certain that her property was disposed of to her children and her husband in such a way that neither husband nor children could alter the disposition she desired. The creation of the trust in issue here accomplished that purpose. Apparently, for reasons not germane to the court's determination, she had a change of heart, but that change of heart comes too late.

Accordingly, the case is dismissed. Judgment and costs are awarded to defendants.

IT IS SO ORDERED.