Pauline L. **HARRISON**,
**Plaintiff–Appellant,**

v.

**Ruth Harrison GROBE, Alfred C. Harrison, Jr., Wilmington Trust Company, Defendants–Appellees.**

**No. 387, Docket 92–7605.**

United States Court of Appeals,
Second Circuit.

Argued Dec. 10, 1992.

Decided Feb. 1, 1993.

Lawrence H. Cooke, Albany, NY (Charles F. Gibbs, Thomas J. McCormack, Leily Lashkari, Chadbourne & Parke, New York City, of counsel), for plaintiff-appellant.

Thomas R. Hunt, Jr., Wilmington, DE (Alan J. Stone, Morris, Nichols, Arsht & Tunnell, Irwin J. Sugarman, David J. Murray, Schulte Roth & Zabel, New York, N.Y., of counsel), for Ruth Harrison Grobe, Alfred C. Harrison, Jr. and Wilmington Trust Company, defendants-appellees.

Before: MESKILL, Chief Judge, OAKES and KEARSE, Circuit Judges.

OAKES, Circuit Judge:

Pauline Harrison ("Harrison") appeals from a judgment of the United States District Court for the Southern District of New York, Robert L. Carter, *Judge*, dismissing her complaint in a diversity action. The district court determined that an irrevocable trust created by Harrison was not void. For the reasons set forth below, we affirm.

## BACKGROUND

We begin with only a brief review of the facts of this case as they are thoroughly presented in the district court opinion. *Harrison v. Grobe*, 790 F.Supp. 443 (S.D.N.Y.1992). On May 2, 1990, Harrison, aged 72, suffered a stroke. Apparently in response to concerns that she might suffer a second stroke, Harrison established an irrevocable trust (the "Trust") on June 6, 1990 which provided her with income for life and, upon her death, divided the remainder among her four children and Boyd deBrossard, her companion and then soon-to-be husband. Harrison delivered 360,000 shares of DuPont stock, representing the bulk of her $20 million estate, to her lawyers on June 12, 1990 to fund the Trust, and that same day she signed an amendment to the Trust, suggested by the Wilmington Trust Company, that required unanimous consent among the trustees to change the terms of the Trust, rather than the majority consent of the original instrument. Harrison named herself, the Wilmington Trust Company, her daughter Ruth Harrison Grobe ("Ruth"), and her son, Alfred Harrison ("Alfred"), as trustees. Craigh Leonard, Harrison's godson and legal adviser, served temporarily as a trustee in order to help establish the Trust quickly, but, as planned, he resigned on June 27, 1990 and was replaced by Ruth and Alfred.

Harrison now claims that she never intended to create an irrevocable trust, that she misunderstood what she was doing on June 6 as well as on June 12 while in a stroke-induced fog, and that she was pressured to sign the document by her children and lawyers. Harrison filed suit in federal district court to have the Trust undone on the basis of incapacity, mistake, duress, undue influence, and unconscionability. After a four-and-a-half-day bench trial, the district court addressed each of these theories and found no adequate grounds to invalidate the Trust.

On appeal, Harrison raises three claims. First, Harrison contends that the district court did not properly apply New York law and failed to scrutinize sufficiently the circumstances behind the creation of the Trust in light of the fiduciary relationship that existed between her and her children. Second, Harrison argues that Ruth and Alfred unduly influenced her, causing her to create the Trust. Finally, Harrison claims that the Trust should be set aside on the grounds of unconscionability, primarily on the basis that she was forced into creating a Trust that she did not understand. We find none of these arguments persuasive.

## DISCUSSION

█ All three of Harrison's claims require this court to review the factual findings of the district court. In reviewing the factual findings of a district court, we apply a "clearly erroneous" standard. Fed.

R.Civ.P. 52(a). "A finding is 'clearly erroneous' when, considering the entire record, the reviewing court is 'left with a definite and firm conviction that a mistake has been committed.'" *McNeil–P.C.C., Inc. v. Bristol–Myers Squibb Co.*, 938 F.2d 1544, 1550 (2d Cir.1991) (quoting *Anderson v. City of Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985)).

■ Harrison's first claim is presented as a challenge to the district court's application of New York law. Harrison argues that the district court properly recognized that a fiduciary relationship existed between her and her children, but erred in failing to shift the burden of proof to the defendants to show that she fully understood the nature and effect of the Trust and that there was no mistake or undue influence. According to Harrison, the burden of proof should have been shifted since Ruth and Alfred benefited from the Trust and collaborated with her lawyer, Leonard, in creating the Trust. In support of this argument, Harrison points to cases such as *Ten Eyck v. Whitbeck*, 156 N.Y. 341, 353, 50 N.E. 963, 967 (1898), in which the New York Court of Appeals required "extreme vigilance" in reviewing transactions between parents and children.

Despite Harrison's allegations to the contrary, the district court fully addressed the question whether the burden of proof should have been shifted. The court correctly stated that, in addition to establishing that her children were beneficiaries of the Trust, Harrison needed to show that her children dealt with her on unequal terms in order to shift the burden of proof. *See, e.g., Barnard v. Gantz*, 140 N.Y. 249, 256–57, 35 N.E. 430, 432 (1893). In applying this rule, the district court held that there was no evidence that Alfred and Ruth "dealt on unequal terms with Harrison or exercised improper influence over her decision to execute the trust." *Harrison*, 790 F.Supp. at 457.

We find that the record supports the district court's determination. Harrison herself proposed the terms of the Trust and her children had no knowledge of the Trust terms until after its execution. While there is evidence that Alfred and Ruth attempted to persuade Harrison to place her assets in an irrevocable trust, there is nothing to suggest that their efforts of persuasion destroyed Harrison's free agency or rose to a level sufficient to constitute undue influence. *See, e.g., In re Estate of Bush*, 85 A.D.2d 887, 888–89, 446 N.Y.S.2d 759, 761 (4th Dept. 1981) (undue influence requires showing that the "influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency ...").

Moreover, Harrison's argument is made even less persuasive by the fact that the district court also addressed the merits of Harrison's case on the assumption that the burden of proof was on the defendants and still found no undue influence. As the court stated,

even if the burden of proof were shifted to defendants in this case, requiring them to demonstrate the absence of any exercise of undue influence on their parts in order to sustain the validity of the trust, the court finds that defendants have sustained their burden.

*Harrison*, 790 F.Supp. at 458.

■ Harrison's second and third claims are also without merit. The record supports the district court's findings that Harrison knew that she was creating an irrevocable trust, that she was not unduly influenced by either her children or her lawyers, and that the Trust is not unconscionable. The trial testimony of Harrison's children, lawyers, and doctors demonstrates that Harrison was almost extraordinarily lucid throughout the entire period surrounding the creation of the Trust. Although her stroke had occurred on May 2, 1990, she displayed no comprehension problems when visiting her treating neurologist on May 18, 1990, she won a duplicate contract bridge tournament on May 23, 1990, she gave a speech to the New York State Republican Family Committee on June 6, 1990 introducing the inventor of the RU486 abortion pill, and participated forcefully, intelligently, and consistently with her pre-stroke personality in conversations with her children and her lawyers on many occasions. In addition, Harrison's independence from her children's influence was further demonstrated when she married Boyd deBrossard

on June 20, 1990, despite some concerns expressed by one or more of her children, and when she persuaded the other trustees, including her children, to sign an agreement on July 20, 1990 to distribute one million dollars of the Trust assets to deBrossard as a wedding gift, an agreement permissible under the terms of the Trust.

Harrison relies heavily on a memorandum, dated June 14, 1990, from one of the members of Leonard's firm, Jean Angell, to Leonard as substantiation of her claims that she was unduly influenced by her children and did not understand the terms of the Trust. The memorandum summarizes conversations Angell had with Harrison and her children concerning the Trust. For example, Angell recalls that Harrison stated that she was "doing what Ruth wants me to do" in handing over the DuPont stock on June 12, 1990 for placement in the Trust. Although this statement and others support an inference that Harrison's children helped to persuade Harrison to create and fund the Trust, these statements are also consistent with the district court's findings that Harrison's decision was well-informed and made in accordance with her own free will. As we have stated in our discussion of undue influence, the relevant question is not whether Harrison did what her children wanted her to do, but rather whether Harrison also did what she wanted to do. *See In re Estate of Bush*, 85 A.D.2d at 888–89, 446 N.Y.S.2d at 761. The record as a whole supports the district court's findings that Harrison created and funded the Trust of her own volition and without being unduly influenced. The memorandum of Angell does not undermine this determination.

The memorandum also fails to support Harrison's contention that she did not understand—as much as lay-settlors generally understand—the terms of the Trust. In the memorandum, Angell recounts to Leonard that Harrison appeared not to like certain of the Trust terms and intended to withdraw some of the securities, presumably as a gift for deBrossard. Harrison asserts that Angell's statements demonstrate that she did not know that she could not freely amend or revoke the Trust. However, this interpretation is contradicted by testimony from both Leonard and Angell that they explained the terms of the Trust to Harrison and that she understood and agreed to the terms when she created the Trust and when she signed the amendment requiring unanimous consent among the trustees. Moreover, Harrison ultimately was able to provide deBrossard with a million dollar wedding gift from the Trust. Finally, even if we were to accept Harrison's interpretation of the memorandum, we could not hold that the district court's findings were clearly erroneous. *Anderson*, 470 U.S. at 574, 105 S.Ct. at 1511 ("Where there are two permissible views of the evidence, the factfinder's choice between them cannot be clearly erroneous.").

In sum, we believe that the district court's treatment of Harrison's claims was both thorough and well supported by the record.

### CONCLUSION

Accordingly, the judgment of the district court is affirmed.