**RUDOLF NUREYEV DANCE FOUN-DATION, an Illinois not-for-prof-it corporation, Plaintiff,**

v.

Roza NOUREEVA–FRANCOIS, Razida Evgrafova, Gouzel Noureeva, Alfia Rafi-kova–Yagudina, Victor Evgrafov, and Yuri Evgrafov, Defendants.

No. 94 CIV. 7701 DC.

United States District Court, S.D. New York.

June 26, 1998.

Nisen & Elliot by Michael H. Moirano, Robert B. Christie, Chicago, IL, Schulte Roth & Zabel, LLP by F. Peter Phillips, Robert M. Abrahams, New York, NY, for Plaintiff.

Rosenman & Colin by Gerald A. Rosenberg, Stacey B. Creem, New York, NY, for Defendants Roza Noureeva–Francois and Gouzel Noureeva.

## AMENDED OPINION

CHIN, District Judge.

Rudolf Nureyev was perhaps the greatest dancer of his time. He will be remembered not only for his brilliance on the stage, but for his daring flight to freedom in 1961, when he became the first of the great Russian dancers to defect to the West. He continued to dance, as a free man, for three decades.

Nureyev died of AIDS-related illnesses in Paris on January 6, 1993. Although he was penniless when he defected, he eventually amassed a fortune and left a world-wide estate worth some $21 million.

Two months before his death, Nureyev donated his American assets, with a value of $7 million, to a newly-created dance foundation. , After his death, his sister and niece objected to the transfer. The dance foundation then commenced this action to "quiet title"—to obtain a judgment declaring the gifts valid. Nureyev's sister and niece filed counterclaims seeking to void the transfer. They contend that Nureyev was not of sound mind when he executed the deeds of gift and that Nureyev was unduly influenced by his attorney, who was appointed by Nureyev to run the foundation. They contend further that the attorney took advantage of Nure-

yev's weakened state to gain control of a $7 million foundation.

This case was tried to the Court in November 1997. Having considered all the evidence and the parties' arguments, I find that Nureyev's gifts to the dance foundation, the Rudolf Nureyev Dance Foundation ("RNDF"), were validly made and that Nureyev was of sound mind when he made them. In addition, I find that Barry Weinstein, Nureyev's attorney, did not unduly influence Nureyev.

Rudolf Nureyev was a strong-willed person who dared to defy a government. He was not a person who could be manipulated or unduly influenced, and this remained true even near the end. He was surrounded by close friends who were articulate, successful people, who cared for him immensely, who were willing to disrupt their own lives to be with him, and who would not have let anyone take advantage of him. It is also clear that although Nureyev's dancing would not have been forgotten, he nevertheless wanted to leave behind a legacy. Charles Jude, one of Nureyev's closest friends, testified that Nureyev "thought he cannot die, he is a god" (Tr. 203), but Nureyev knew that he was a mere mortal in body. He wanted his name and spirit to carry on after his death and he created the foundation for that purpose. The evidence demonstrates unequivocally, and I so find, that Weinstein carried out the wishes of his client in good faith at all times and in an able and conscientious manner.

Accordingly, judgment will be entered in favor of plaintiff. Pursuant to Fed.R.Civ.P. 52, my findings of fact and conclusions of law follow.

## STATEMENT OF THE CASE

### A. The Facts

#### 1. Rudolf Nureyev

Nureyev was born on March 17, 1938, on a train en route to Vladivostock, where his father was serving in the Russian army. In 1959, he joined the Kirov Ballet Company as a dancer. He quickly became a soloist, performing in ballets such as *Swan Lake*.

On June 16, 1961, he defected to the West. At the end of a tour in Paris with the Kirov Ballet Company, as he was about to be returned to Moscow by two Russian policemen, he presented himself to French customs inspectors at Le Bourget airport. He requested political asylum, declaring, "I want to stay. I want to stay." (Rudolf Nureyev, *The Bid for Freedom* (hereinafter *Bid for Freedom* ), *in Rudolf Nureyev, Three Years in the Kirov Theatre* 16, 23 (T.I. Zakrshevskaya, et al., eds., 1995) (hereinafter *Three Years in Kirov Theatre* ) (*see* PX 141)).

Nureyev explained his reasons for defecting as follows:

Now and then in life one has to take a decision like lightning, almost quicker than one can think. I have known this in dancing when something on the stage goes wrong. That is how it felt that hot morning in June 1961 on Le Bourget airfield, outside Paris, as I stood in the shadow of the great Tupolev aircraft which was to fly me back to Moscow.

Its huge wing loomed over me like the hand of the evil magician in Swan Lake. Should I surrender and make the best of it? Or should I, like the heroine of the ballet, defy the command and make a dangerous—possibly fatal—bid for freedom? During my stay in Paris I had felt the threat mounting. I was like a bird inside a net being drawn tighter and tighter. I knew this was a crisis.

For a bird must fly. I see nothing political in the necessity for a young artist to see the world: to compare, assimilate, to enrich his art with new experiences, both for his own profit and that of his country. A bird must fly, see the neighbor's garden and what lies beyond the hills, and then come home, enrich his people's lives with tales of how others live and the broadened scope of his art.

(*Bid for Freedom* at 16).

When Nureyev defected, he abandoned all that he had owned, including what he described as his "dearest worldly possessions"—a collection of ballet shoes and leotards purchased during his travels around the world. He described how he felt moments after he defected, as he was being led away by the French authorities:

This was freedom, yet ironically, freedom was taking on the form of its exact opposite. Once again, policemen were on either side of me, but French this time. I was entering on a new life almost naked as when I was born.

(*Bid for Freedom* at 24).

Nureyev's "new life," of course, was a phenomenal success. After his death, he was described as:

the world's most famous dancer, a man who spent a quarter of a century on stage performing an average of some three hundred ballets a year. He took the best of Russian ballet with him to the West and in the process became known to people far outside the realm of dance. The leading choreographers of his day—Frederick Ashton and Jerome Robbins, Martha Graham and Twyla Tharp, Roland Petit and Maurice Bejart—created ballets exclusively for him. And Nureyev himself created his own versions of 'Cinderella' and 'Romeo and Juliet,' as well as updating numerous classical ballets. In his lifetime, Nureyev became a living monument to himself . . . .

(*Three Years in Kirov Theatre* at 13).

In April 1992, after he stopped dancing, Nureyev conducted the American Ballet Orchestra for a performance of Tchaikovsky's *Romeo and Juliet* at the Metropolitan Opera in New York City. Jeannette Etheredge, a longtime friend, testified at trial that when she attended the performance, she spent more time watching Nureyev in the orchestra pit than the dancers on stage. (Tr. 307). She explained why:

[I]t was watching him with a new career in his life. And he was also the kind of person that when you saw him on stage, if there were 120 people on that stage, the only person you looked at was him. I mean, he had that kind of magnetism.

(Tr. 312).

### 2. *Nureyev's Family*

Nureyev had three sisters: Roza Noureeva–Francois ("Roza"), Razida Evgrafova

("Razida"), and Lilla ("Lilla"). Roza had a daughter, Gouzel Noureeva ("Gouzel"). Razida had two sons, Victor Evgrafov ("Victor") and Yuri Evgrafov ("Yuri"). Lilla had a daughter, Alfia Rafikova–Yagudina ("Alfia"), who also had a son, Rustan. Although Roza, Razida, Gouzel, Victor, Yuri, and Alfia were all named as defendants in this case, only Roza and Gouzel appeared in the action.

### 3. BPF

In 1975, in consultation with his Swiss lawyer, Mme. Jeanette Thurnherr, Nureyev established the Ballet Promotion Foundation ("BPF"), a Liechtenstein foundation.[1] BPF had two purposes. First, it was to be used by Nureyev as a repository for his assets during his lifetime and as a vehicle for distributing his wealth after his death. Second, it was to be used to promote dance and to support ballet.

The original beneficiaries of BPF were "dancers and other artists who perform in the art of ballet or persons who are related to the ballet." (PX 1). In 1980, BPF's "Deed of Formation" was amended to include as beneficiaries persons "who are closely connected with the dancer Rudol[f] Nureyev, in particular his mother, his sisters and their descendants." (PX 3; see also PX 35 at 8). The Deed of Formation was later amended again to clarify that "[f]urther beneficiaries of the foundation may be dancers and other artists performing the art of ballet or persons related to the ballet." (PX 35 at 8).

Nureyev discussed the subject of plans for his family with Thurnherr again in 1988. Thurnherr later prepared a memorandum in which she noted that she and Nureyev had discussed the use of BPF assets to provide "benefits" for his family, including "grants" for education, fellowship, and travel. (PX 12 at 14). It was clearly Nureyev's desire to use BPF to provide for his family as well as to promote dance.

### 4. Nureyev's Lawyer

Barry Weinstein, a Chicago businessman, is the President of RNDF. Although he is no longer practicing law, he was Nureyev's attorney for some 20 years, representing Nureyev in tax, estate, and other matters until Nureyev's death. He started representing Nureyev in 1974, primarily with respect to tax matters, when he was introduced to Nureyev by Sandor Gorlinsky, Nureyev's manager in London.

Weinstein's role gradually expanded as he continued to perform legal work for Nureyev throughout the 1980's and into the early 1990's. Although Nureyev was an important client, Nureyev's work accounted for less than five percent of Weinstein's business.[2]

In time, Nureyev began to rely more heavily on Weinstein, and he started calling on Weinstein for assistance even for matters outside the United States. In 1988, Nureyev asked Weinstein to become involved in the proposed purchase, for some $2.4 million, of a group of islands known as Li Galli in the Gulf of Salerno in Italy.[3] At the same time, Nureyev asked Weinstein, in conjunction with Thurnherr, to review his worldwide portfolio of properties for tax planning purposes.

### 5. Nureyev's Acquisitions

Although Nureyev was penniless when he defected in 1961, in time he acquired valuable real estate, artwork, and antiques. In 1980, he purchased an apartment in the Dakota in New York City. In 1981, he purchased Wood-

---

1. BPF has changed its name to the Rudolf Nureyev Foundation. To avoid confusion, I will continue to refer to it as "BPF."

2. Weinstein billed Nureyev on an hourly basis. Nureyev was slow in paying Weinstein's bills, taking as long as a year or two at times to pay, but Weinstein was not troubled by the delays and was always paid eventually.

3. Weinstein became involved in the Li Galli transaction in part because Nureyev was unhappy with his other advisers, who counselled against the purchase of the islands. The Li Galli islands, however, were important to Nureyev because they were part of the story of the Russians coming to work and dance in Europe. The islands were once owned by a Russian choreographer named Diaghilev, who directed a group of Russian dancers, including a dancer named Nijinsky, who toured Europe several times a year. Diaghilev sold the islands to another choreographer of Russian ballet, whose son was also a choreographer. Nureyev bought the islands from the son. They were important to him for these historical reasons.

burn Farm, a 500–acre farm in Virginia. In 1982, again with Weinstein's assistance, Nureyev sold the Dakota apartment and purchased a larger one in the Dakota. Weinstein represented Nureyev in each of these transactions. In addition to providing legal services, Weinstein helped Nureyev select the properties.

Nureyev also owned a home in La Turbie, France, and two apartments at Quai Voltaire in Paris. He also maintained a residence in Monte Carlo. He eventually purchased the Li Galli islands in Italy as well as a home in St. Barthelemy ("St. Bart's") in the French West Indies.

In addition to acquiring real property, Nureyev was an avid collector of artwork (Old Master paintings, prints, and sculptures), furniture (including, for example, a 17th century Wainscot armchair, a 16th century Elizabethan "bedstead," a 17th century baroque cabinet, and a Victorian copper bathtub), antique chandeliers, musical instruments, jewelry, and ballet costumes. Most of the contents of the Dakota apartment were sold at an auction at Christie's in January 1995 that netted (after commissions and expenses) some $5 million. (Tr. 67).

At the time of his death, Nureyev's worldwide assets were worth approximately $21 million, roughly $7 million of which was attributable to the assets in the United States. (Tr. 66).

With assets all over the world and property in at least five different countries, Nureyev faced potential tax problems that required sophisticated tax and estate planning.

### 6. *Nureyev's Desire for Immortality*

Nureyev had long talked about establishing a school for dance, in part to perpetuate his name. Charles Jude, the star of the Paris Opera Ballet and one of Nureyev's closest friends, testified (in heavily accented English) that as early as 1985 Nureyev talked about establishing "a big school for dance, for dancer, for choreographer." (Tr. 182). When asked whether Nureyev ever discussed what he wanted to do with his money upon his death, Jude testified as follows:

I know [Rudolf] want to put all his money for his name first, for his name for the dance because his name is good with the dance. And he want to put everything to have his name go on as long as possible.... He thought if he give this money to [dance], his name would be immortalized.

(Tr. 183). Nureyev also specifically told Jude that he wanted to do something for dance in America, for America was "very important for him." (Tr. 184).

Andre Larquie, another long-time friend of Nureyev, confirmed that Nureyev "was always wishing to do, when he would not dance any more, to do something for the dancer and for ... the improvement of the choreographic art." (Tr. 758). Roza, Nureyev's sister, testified at her deposition as follows:

Q. Would you agree that it would be consistent with your brother's life if his money was used to support ballet?

A. I think that we should continue everything, his work, his work; that's what he wanted.

(Roza Dep. at 45).

Ironically, Nureyev's potential tax problems led him to finally act on his long-held desire to do something with his financial assets for dance. In October 1988, Nureyev met with Thurnherr and Weinstein in New York to discuss his holdings and the potential tax issues. Among other things, they discussed the Dakota, the valuable art and other property that Nureyev kept there, and the possibility of creating a United States trust. (PX 13 at 6) (notes stating "find a suitable arrangement to avoid estate tax (U.S. trust in the event of death?")). Weinstein later concluded that Nureyev should form a United States foundation and contribute the Dakota assets to the foundation. He conveyed this recommendation first to Thurnherr and eventually to Nureyev.

Weinstein met with Nureyev on January 22, 1989. They discussed a number of matters relating to his assets, including BPF. They also discussed the creation of a United States foundation that would serve two purposes: promoting dance in the United States and avoiding taxes. (*See, e.g.,* PX 21).

Nothing further transpired in this respect, however, until April 1992.

### 7. Nureyev's Illness

In October and November 1991, Nureyev toured five cities in Australia. (Tr. 69). It was the last time he ever danced. During that time he met Neil Boyd and later hired him to be his personal assistant. Nureyev told Boyd then that he was not going to be dancing much longer and that he was going to try conducting music. (Tr. 72).[4]

Boyd commenced employment with Nureyev in March 1992, joining Nureyev in Moscow. Nureyev was en route to Kazan, where he remained for about a week rehearsing his conducting with a full orchestra. (Tr. 71). Nureyev became seriously ill while in Kazan. He then went to St. Petersburg for about six days, where he celebrated his birthday on March 17th. Unfortunately, his medical condition was "getting worse and worse." He did not immediately return to Paris, however, because his friend Jerome Robbins was performing in St. Petersburg and Nureyev wanted to see his friend perform. He left almost immediately after the performance for Paris, where he was hospitalized and underwent surgery.

Nureyev remained in the hospital for approximately two weeks. Boyd visited on a daily basis, bringing Nureyev his mail as well as newspapers and journals. Nureyev reviewed his mail with Boyd (giving him instructions), read the newspapers (one English, one French), and watched television. He also practiced conducting as he lay in his hospital bed listening to music on headphones, following the score on music sheets, and waving a baton.

Robert Tracy, who described himself and Nureyev as being "close friends" for 14 years, also visited Nureyev in the hospital in Paris. Tracy was concerned that Nureyev was going to die soon. At one point Nureyev asked Tracy to call some friends and colleagues to tell them that "it was near the end for him." (Tr. 258). One of those individuals was Weinstein.

Tracy called Weinstein in Chicago in early April, telling him that Nureyev was very ill and that Nureyev wanted to see him. Weinstein was not anxious to go, for he had just returned to Chicago from a two-week vacation. Nevertheless, because Nureyev was ill and needed his assistance, Weinstein flew to Paris, arriving on April 13, 1992. (Tr. 492).

### 8. The Paris Wills

Within a few hours after arriving in Paris, Weinstein met with Nureyev at his apartment at Quai Voltaire to discuss his wishes with respect to the transfer of his assets. They discussed the possibility of starting a museum about Nureyev and reviewed Nureyev's family tree. (See PX 38). They also discussed the American property and the issue, once again, of taxes. Nureyev told Weinstein to form an American foundation to benefit dance and dancers. He also told Weinstein that he wanted Weinstein to run the foundation. (Tr. 501–03; PX 38).

Following the meeting, Weinstein spoke with Thurnherr. The next day, both of them met with Andre Larquie, a friend of Nureyev, about the idea of a museum dedicated to Nureyev's life. Weinstein met with Nureyev again and afterwards he returned to his hotel to draft the documents, which he did that afternoon.[5]

Nureyev executed five documents on April 14, 1992: a will bequeathing all his personal property and real estate located in the United States to the "Rudolf Nureyev Charitable

---

4. Although Marika Besobrasova, another of Nureyev's close friends, acknowledged at her deposition that Nureyev's illness affected his dancing as his illness progressed, she stated: "Voilà. The feeling inside was still there." (Besobrasova Dep. at 59).

5. At trial, Weinstein acknowledged that the execution of the documents in Paris was done in a "hurried" manner. (Tr. 543). He moved quickly initially because he was told Nureyev was gravely ill. In fact, Nureyev was not as sick as Tracy had led Weinstein to believe. Still, Weinstein continued to move quickly because "Rudolf was in the mood to do it." (Id.). Noting that three years had passed since Nureyev had first spoken to him about starting the foundation, Weinstein testified: "[T]his [was] the first time in my experience with Rudolf that he wanted to complete this, and I felt that it was a good time to complete it." (Tr. 543–44).

Foundation" (PX 41); a "last will" directing that Austrian law apply in the event instructions that he had given BPF be interpreted as a last will (PX 42); instructions to the trustees of BPF (PX 43); an application for a 501(c)(3) tax exemption for the "Rudolf Nureyev Charitable Ballet Foundation" (misdated April 13, 1992) (PX 44); and a power of attorney authorizing Weinstein to represent Nureyev in obtaining the tax exemption. (PX 45). The two wills were witnessed by Boyd, Gouzel, and Douce Francois ("Douce"), a long-time, trusted friend of Nureyev.

The instructions provided for certain "legacies" to Nureyev's family members, including $200,000 for Roza and $50,000 for her daughter, Gouzel. (PX 43). They provided that Roza would have the right to live in Nureyev's Monaco apartment free of charge for the rest of her life. They provided for certain payments to Douce and Maude Gosling. They also provided that:

> It is my wish that all my assets whether movable or immovable and all my bank accounts wherever situated (except real property situated in the United States) including the shares of Woodburn Estate, the shares of Ballet Monde SA, the property Quai Voltaire, Paris, the property Saint Barthelemy, Leeward Islands, located in the French West Islands, Guadaloupe; La Turbie (owned by SCI L'Arcadie, Monaco) be allocated and—if not already done— legally transferred to Ballet Promotion Foundation, Vaduz, as per the date of my death.

(*Id.*). Nureyev intended by the latter provision to transfer, on his death, all his assets to BPF, the European foundation, except the Dakota apartment and its contents, which he intended to transfer to an American dance foundation that had not yet been formed. (Tr. 516–19).

On April 15, 1992, Nureyev signed some additional, hand-written instructions to the Trustees of BPF. (PX 49). These instructions provided further benefits for certain of his family members. At Thurnherr's request, Weinstein also asked Nureyev to sign bank instructions that would have, upon his death, transferred certain bank accounts and deposits to BPF. (PX 48). Nureyev, however-er, refused to sign the bank instructions. (Tr. 526–28).

After the April 15th meeting, Nureyev went to the hospital for treatment. He was accompanied by Weinstein and Douce. Afterwards, they started to drive to the opera. Traffic was bad, however, and Nureyev became impatient. Leaving Douce in the car, he "grabbed" Weinstein and led him into the subway to complete the trip to the opera. Weinstein described the scene as follows:

> [Nureyev] knew exactly what stop to get off. The subway pulled up right under the Bastille Opera House. He was wearing one of his costume capes. He walked in like he was the regal prince of the whole opera, after all that treatment . . . .
>
> We attended the opera, *Tales of Hoffman*. Afterwards there was a party at which he was a guest. He had me join him with a number of other people from France. We retired about 2:00, 3:00 in the morning.

(Tr. 528–29).

The next day, Weinstein returned to Chicago.

### 9. *The New York Wills*

Back in Chicago, after reviewing the documents that had been executed in Paris, Weinstein became concerned about potential problems with the American will. The American foundation that was the intended beneficiary of the American will had not yet been created. Weinstein also thought the American will should conform to New York requirements because the property was located in New York. Weinstein thought that Nureyev could execute a new will later in the month in New York, when Nureyev was scheduled to conduct *Romeo and Juliet* at the Metropolitan Opera in New York City. In the meantime, he incorporated the American foundation, RNDF, and started the process of obtaining a 501(c)(3) tax exemption.

Nureyev arrived in New York on April 24th. Weinstein flew into New York on April 28th. The same day, Nureyev executed another will, which provided in pertinent part as follows:

> I give and bequeath all my tangible property, intangible property including my

shares in the Dakota, Inc. and all my real estate which are located in the United States, which I own at my death, to the Rudolf Nureyev Dance Foundation, an Illinois Not–For–Profit Corporation.

I give and bequeath the rest, residue and remainder of my estate located in the United States, of all kinds, real and personal to Rudolf Nureyev Dance Foundation, an Illinois Not–For–Profit Corporation.

(PX 60). The will named Weinstein as executor.

The will was witnessed by Tracy, Boyd, and Jane Hermann, the head of the American Ballet Theatre. (Tr. 110). They watched as Weinstein explained the formalities and as Nureyev executed the will.

Nureyev also executed a "Last Will" relating to BPF, which was also witnessed by Tracy, Boyd, and Hermann. (PX 59). Tracy, Boyd, and Hermann were also asked to, and did, initial the April 14, 1992 typed instructions and the April 15, 1992 hand-written instructions to the trustees of BPF. (PX 61, 62).

After Nureyev executed the documents, Weinstein asked him, once again, on Thurnherr's behalf, to sign the bank transfer forms that he had refused to sign in Paris. Nureyev again refused to sign them.

Many of Nureyev's friends came to New York to see him conduct.[6] The ballet was performed, with Nureyev conducting the orchestra, on May 6, 1992. (Tr. 103, 105). After the performance, Nureyev hosted a party at the Dakota that lasted virtually all night. Nureyev left New York the next day to go to Woodburn Farm in Virginia.[7]

During the time that he was in New York, although he received medication and was tended to by a nurse, Nureyev rehearsed, both alone and with the orchestra, and he also spent a great deal of time socializing with friends. He went to shows and movies, followed by dinner, and entertained guests at his apartment in the Dakota. (Tr. 107–08).

### 10. *La Bayadère*

After the visit to Virginia, Nureyev returned to New York and then to Paris. Over the next few months he travelled extensively, including to St. Petersburg, Kazan, Moscow, Vienna, Naples, Berlin, and San Francisco. Although Nureyev was, during this time, a "dying man who knew he was dying" (Tr. 133), he continued to conduct, rehearse, read music, and lead his life.

On October 9, 1992, the ballet *La Bayadère*, choreographed by Nureyev and performed by the Paris Opera company, premiered in Paris. It was then that the world learned that Nureyev was dying of AIDS. The newspaper headlines read "Dying Swan." (Tr. 138).

Nureyev was involved in rehearsals of *La Bayadère* in September 1992. He went back and forth to rehearsals from the hospital, where he continued to receive treatment. He was well enough, however, to work with the dancers and to show them the steps that he had choreographed. He sometimes did the steps himself to show the dancers what he wanted. Jude testified that, although the premiere generated a great deal of interest because people were concerned that this would be Nureyev's last choreography, Nureyev himself was not concerned, for, as Jude

**6.** Etheredge, who often conversed with Nureyev in Russian, came all the way from San Francisco. She spent most of her time in the kitchen cooking for Nureyev and his friends. She explained why:
A. I was in the kitchen all the time.
...
THE COURT: Why did you do that? [W]hy would you come to New York and—
THE WITNESS: And be in the kitchen?
THE COURT:—spend all of this time in the kitchen cooking for people?
THE WITNESS: It was for Rudolf. It was because of him.

(Tr. 305).

**7.** Wallace Potts, a close friend of Nureyev for many years, testified at his deposition that Nureyev did not like to remain in a city after a performance. As he explained, "After [Rudolf] finished the engagement, the gypsy in him, he moved on." (Potts Dep. at 96). Likewise, Douce testified at her deposition that Nureyev "was dancing, more or less, 200 times a year; he's not a person who is staying very long in a place." (Douce Dep. at 12).

described it, "Rudolf thought he cannot die, he is a god and he cannot die." (Tr. 203).

At her deposition, Hermann recalled that Nureyev discussed the issue of his death with her only once before 1992:

> I remember, we were in Tokyo, and I remember [Rudolf] becoming very upset, I think as a result of some review that may have been less than laudatory, indicating how long is Nureyev going to dance .... And he was very specific to say that he was fearful that if he stopped dancing, he would die.
>
> He definitely equated the activity of performing with keeping him alive.

(Hermann Dep. at 56).

### 11. *The Final Arrangements*

On October 10th, the day after the premiere of *La Bayadère*, Weinstein met with Nureyev in Paris to discuss Nureyev's continuing tax problems as well as several other issues, including a telephone call Weinstein had received from an attorney who was representing Robert Tracy. In April 1992, when Tracy was witnessing the execution of the will, he noticed that he had not been provided for in the will. He hired a lawyer, Marvin Mitchelson, who had called Weinstein to make a claim that Nureyev was obligated to provide Tracy with financial support.[8]

In the course of the meeting, Weinstein suggested to Nureyev that he should consider transferring his American assets to the American foundation, RNDF, before his will took effect, that is, while he was still alive. Weinstein suggested to Nureyev that such a transfer would save "a lot of probate expenses" because, among other things, "a probate estate would open up claims from everyone." (Tr. 553–54). In addition, Weinstein said a transfer of assets would "make it more difficult" for Tracy and his lawyer to pursue Nureyev. (Tr. 553). Weinstein also discussed with Nureyev the fact that he would be taxed in France on all his assets worldwide if he died a resident of France. (Tr. 560–61).

Weinstein also discussed with Nureyev a difficult subject: Nureyev's choice of a place to be buried. Weinstein described the conversation as follows:

> I actually didn't say buried. I said your resting place. And he said—he said to me what do you mean? And—he says what do you mean[,] buried? And I said yes, the final place.

(Tr. 556). Nureyev wanted to be buried on one of his Li Galli islands in Italy, but Weinstein told him that was not a good idea because there was a possibility they would have to be sold someday. Weinstein made two suggestions, which he had gotten from Andre Larquie, of cemeteries in France. One was located outside of Paris and was referred to as the "White Russian" cemetery because many Russians, including aristocrats and writers who had left Russia after the Revolution, were buried there. The other was located in the middle of France and was the burial site of a number of performing artists. In the end, Nureyev was buried in the White Russian cemetery.

While in Paris following the October 10th meeting, Weinstein consulted with a French "notary," a legal expert, who advised that if Nureyev died a resident of France, his worldwide estate would be subject to a tax in excess of 50%. In other words, the tax on his estate, as it existed then, would be in excess of $10 million. Transfers of assets prior to his death would take the property out of his estate, the notary explained, and they would be subject only to a much less burdensome transfer tax. The notary recommended that Nureyev sell, while he was still alive, the French properties and the St. Bart's property to BPF. By selling these properties, Nureyev would reduce the possibility that he would be considered a French resident when he died.

Weinstein returned to Chicago, where there were several messages waiting for him from Tracy's attorney. Weinstein spoke with Thurnherr about his meeting with Nureyev,

---

**8.** Tracy's claim was eventually settled. Wallace Potts, who was close to Nureyev for many years, testified at his deposition that at one point Tracy called, saying that " 'Rudolf owes us a lot' " and apparently trying to solicit Potts to join Tracy in a "two-party suit against Rudolf." (Potts Dep. at 151). Potts was not interested.

and Thurnherr shared Weinstein's concerns. At that point, Weinstein felt "there was a greater sense of urgency because Rudolf was very sick and we knew that he was getting weaker." (Tr. 616).

In the week after his return from Paris, Weinstein had a series of telephone conversations with Nureyev and recommended that Nureyev go ahead and transfer the American properties to RNDF and sell the French properties to BPF. Weinstein explained to Nureyev that if he donated the American property, i.e., the Dakota apartment and its contents, to RNDF, he could no longer live at the Dakota, although he could visit. In addition, Weinstein explained that because RNDF had no assets yet, Nureyev would have to pay the expenses. Weinstein explained that Nureyev could continue to live in the French property even after he sold it. Nureyev agreed to the transfers, saying "let's do it." (Tr. 618).

### 12. *The Deeds of Trust*

Weinstein spoke to Thurnherr about his conversation with Nureyev. They decided that Weinstein should prepare the documents for the transfer of the American property while Thurnherr would prepare the documents for the French properties. Weinstein drafted the documents for the American property and made arrangements for Nureyev to execute the documents in St. Bart's. Nureyev had flown to St. Bart's with Etheredge, Charles Jude, and Jude's wife, after the premiere of *La Bayadère*.[9] Thurnherr arranged for a French "notary" to be present to execute the transfers.

Weinstein called Nureyev in St. Bart's, and Etheredge answered the phone. Weinstein told her that a French notary would be coming to Nureyev's house with documents for Nureyev to execute. He asked Etheredge to assist Rudolf in signing the documents. She told him that she did not want to be responsible, in part because she did not speak French, and she asked Weinstein to come down to St. Bart's himself. Etheredge then put Nureyev on the telephone and Nureyev agreed that Weinstein should fly down to oversee execution of the documents.

Weinstein flew to St. Bart's on October 21, 1992. He met first with Nureyev and explained again the transfers to him. Weinstein reviewed with Nureyev the documents relating to the American property. Weinstein reiterated to Nureyev that he would no longer be able to live in the Dakota, although he could visit. Nureyev then signed a series of documents: a power of attorney authorizing Weinstein to effectuate the transfer of the Dakota apartment (PX 104); an assignment of the proprietary lease to the Dakota apartment (PX 105); an assumption agreement, signed by Nureyev on behalf of RNDF, whereby RNDF assumed the obligations of the proprietary lease (PX 106); a "Deed of Gift" granting all his personal property at the Dakota to RNDF (PX 107); a "Deed of Gift" granting his interest in the Dakota apartment to RNDF (PX 107A); and the back of a stock certificate transferring his shares in the Dakota cooperative apartment corporation to RNDF. (PX 108). The execution of these documents was witnessed by the French notary as well as Etheredge and Jude. The next day, Nureyev executed

---

9. Etheredge was reluctant to go to St. Bart's, as she had flown to Paris from San Francisco. Nureyev, however, insisted and she relented. Jude did not want to go to St. Bart's, in part because he had to dance *La Bayadère* and also because Nureyev's doctor did not think Nureyev should go. Nureyev, however, insisted, and Jude relented as well. Jude's wife, Florence, a *premiere danceuse* with the Paris Opera, had danced *La Bayadère* with Nureyev some 15 years earlier.

Nureyev's dog also accompanied the group to St. Bart's. Nureyev had obtained the dog in September 1992 from a pound for sick dogs. He named the dog "Solaria," after Solor, the hero of *La Bayadère*. Nureyev could not name the dog Solor, his first choice, because the dog was a

female. Etheredge testified about Solaria as follows:

> I hated that dog. [Rudolf] had called me; he told me that he had bought a dog. He had always wanted a dog. Now he had gotten this little Rottweiler. He was very excited on the phone telling me he had gotten a Rottweiler. I told him the dog better speak English by the time I get to Paris because I wasn't going to speak French to that dog. When I got there, the dog didn't speak French, didn't speak Russian, didn't speak English; it spoke nothing.

(Tr. 357–58). After Nureyev's death, Besobrasova took possession of Solaria. Four years later, Solaria was alive and well, as she even accompanied Besobrasova to her deposition.

an additional document, a power of attorney authorizing Weinstein to manage and operate the Dakota property. (PX 110). This document was witnessed by Etheredge.

Nureyev did not want to leave St. Bart's, as he apparently wanted to live out what remained of his life on the island. As Jude recalled, "Rudolf say to me, why we don't stay in St. Bart's." (Tr. 221). Jude knew, however, that Nureyev had to return to Paris for treatment. As they left St. Bart's, Nureyev said to Jude, "I am sure I never come back here." (Tr. 222).

### 13. *Nureyev's Deposition*

In November, Nureyev's condition deteriorated. Nonetheless, he was still well enough to have his deposition taken, to preserve his testimony, for the Tracy matter. (*See* DX FA). The deposition was conducted at Nureyev's home in Paris on November 13, 1992. The transcript shows that Nureyev was cogent and answered the questions in a lucid and intelligent manner. He was articulate and feisty and, at times, irreverent and sarcastic. At one point, he was asked whether Tracy had ever tried to get money from him. Nureyev testified that Tracy had brought up the subject but that "it is like speaking about death, and I don't want to speak about it." (DX FA at 25). He also testified that RNDF had been created to "protect" him from American taxes and to support dance. (*Id.* at 26–27).

Weinstein attended the deposition in Paris and then met with Nureyev afterwards. This was the last time Weinstein saw Nureyev alive.

### 14. *The Death of a Dancer*

In November, Nureyev was hospitalized in Paris. His close friends, including Douce and Besobrasova, visited almost every day.

Jude saw him virtually every day. On December 23rd, Jude told Nureyev that he would not be able to see him on Christmas day because he had to perform in Germany. Nureyev asked Jude if he was taking his daughter with him, and urged him to do so. When Jude answered yes, that he would be taking his daughter with him, Nureyev responded, "*bon papa.*" (Tr. 222–23).

Jude returned from Germany on December 27th, just a few days later. He promptly went to see Nureyev in the hospital. His friend, however, had stopped speaking.

Etheredge flew in from San Francisco in November. She visited Nureyev in the hospital every day. She sat with him and read to him. When she returned to San Francisco after about two weeks, Nureyev's friend, Wallace Potts, took over for the next two weeks. Etheredge then returned to Paris to relieve Potts, until she had to return to San Francisco for Christmas. She did not see Nureyev alive again.

Rudolf Nureyev died on January 6, 1993.

### 15. *RNDF*

On December 10, 1992, a few weeks before Nureyev died, the transfer of the Dakota apartment to RNDF was completed. At that point, RNDF had full control over the Dakota apartment and its contents. The apartment was sold in the fall of 1993. Nureyev's fine arts were sold at the highly successful auction conducted by Christie's in January 1995.

Weinstein became president of RNDF on December 19, 1992. (DX FB). He started spending a great deal of time on foundation work. Although the Board of RNDF had approved a salary of $25,000 per year commencing January 1, 1993, Weinstein did not draw any salary until June 1994, when he was paid $12,500 for his work in the first half of 1993. Eventually, his salary was brought up to date, at $25,000 per year. Weinstein's wife has also been a member of the Board and she has contributed many hours to RNDF's work, without drawing any salary.

Weinstein's daughter, Cynthia, was also enlisted to help, without compensation. In March 1993, Weinstein asked her if she "would mind" living in the Dakota apartment for a month or two, until the apartment was sold. (Tr. 362). Weinstein did not want the apartment to remain empty because it contained many valuables, and real estate brokers, appraisers, representatives from Christie's and Sotheby's, and others were

coming in and out of the apartment. Ms. Weinstein remained some six months, longer than she had expected, because it took longer to sell the apartment than Weinstein had anticipated. Ms. Weinstein did not enjoy living in the apartment.[10]

After the apartment was sold, RNDF had some assets and it was able to commence operations. Jane Hermann, a friend of Nureyev and the former director of the American Ballet Theatre, joined the board, as did Etheredge. For the fiscal year ending ("FYE") June 30, 1994, RNDF awarded grants and scholarships totalling $151,000; for FYE June 30, 1995, $205,181; for FYE June 30, 1996, $260,472; and for FYE June 30, 1997, $314,200. Grants have been made to, among others, the Lyric Opera of Chicago, the School of American Ballet, the Paul Taylor Dance Company, the Paris Opera Ballet, the Martha Graham Center for Dance, the Dance Theatre of Harlem, and the Boston Ballet. Moreover, notwithstanding the expense of this litigation, at the time of the trial RNDF"s expenditures had not exceeded, by any significant amount, the income earned from investments of principal.

To a great extent, RNDF has succeeded in perpetuating Nureyev's name. Its grants have helped to fund numerous performances in Nureyev's honor. For example, it gave $100,000 to the Paul Taylor Dance Company, which put on a program recreating a dance that Paul Taylor had created for Nureyev. When the Paris Opera Ballet performed *La Bayadère* at the Metropolitan Opera House in New York in 1996, RNDF provided the funding for the program, or souvenir book, which contained a section devoted to Nureyev and his "legacy." RNDF also donated in excess of $250,000 over three years to the School of American Ballet to provide an endowment for scholarships for young dancers who otherwise could not afford to attend the school. The scholarship is called the Rudolf Nureyev Dance Scholarship. RNDF also supported Dancers Responding to AIDS, a group that presented "Bequeathed: An evening of works inspired by dancers & choreographers lost to AIDS," which featured a special tribute to Nureyev.

## B. *Prior Proceedings*

This action was commenced by RNDF on October 24, 1994, pursuant to 28 U.S.C. § 1655 as an action to "quiet title" to Nureyev's property in New York. Nureyev's family members were named and served, but only Roza and Gouzel appeared. They filed an answer and counterclaims alleging that: (a) the deeds of gift of the Dakota apartment and its contents to RNDF were not valid because they were improper "testamentary substitutes," i.e., Nureyev did not intend them to be valid until his death; (b) the deeds of gift were null and void because Nureyev's illness left him without "sufficient capacity or competency" to make the gifts; (c) the deeds of gift were null and void because Weinstein had unduly influenced Nureyev; and (d) the deeds of gift were not valid because Nureyev had irrevocably conveyed the property to BPF six months before.

During the course of the litigation, BPF wrote to the Court and advised that BPF had been aware of this litigation from its inception and that BPF was "not claiming an interest in the property which is the subject of this dispute." On August 25, 1995, at the request of Roza and Gouzel, I issued an order directing BPF, which had not been

---

10. She testified:

Q. Were you comfortable living at the Dakota?
A. [I]t wasn't the image of what you would think a luxury apartment in the Dakota would be. It—no, I guess not.... There was ... barely any electricity. There [were] 20-foot ceilings .... The living room kind of had the feeling like this, and there was one little lamp in the corner on the table .... So I would kind of beeline past the whole apartment into the room with my bed and that was home.

...

It had also kind of his energy everywhere, so it had sort of a—you know, kind of a little bit of a creepy feeling. And along with the style of his taste is—he had big ... paintings with men fighting lions and ... he had a mannequin with a [17th century] harpsichord in his bedroom and, you know, at night it looked like a person, and it was just ... not a cozy environment.

(Tr. 368–69; *see also* PX 139 (Christie's catalogue with photographs of the Dakota apartment furnished as it was when Nureyev was living there)).

named as a defendant but which was a "possible claimant," to appear or plead in the case. BPF did not do so and never asserted a claim in this case.

RNDF moved for summary judgment. On May 29, 1997, ruling from the bench, I denied the motion, holding that genuine issues of fact existed for trial.

The parties thereafter waived their right to a jury trial and the case was tried to the Court in November 1997.[11]

## DISCUSSION

Roza and Gouzel attack the validity of the deeds of gift on four grounds: (a) the gifts were improper testamentary substitutes; (b) Nureyev lacked the mental capacity to make the gifts; (c) Weinstein unduly influenced Nureyev; and (d) the property had previously been "gifted" away.

### A. Testamentary Substitutes

#### 1. Standards

■ A valid inter vivos gift requires: (i) intent on the part of the donor to make a present transfer; (ii) actual or constructive delivery of the gift to the donee; and (iii) acceptance by the donee. *Gruen v. Gruen,* 68 N.Y.2d 48, 505 N.Y.S.2d 849, 852, 496 N.E.2d 869 (Ct.App.1986). A donor may transfer ownership of a gift, however, and still retain actual possession of the property—reserving a life estate in the object, for example, and transferring a remainder interest in the property to the donee—so long as the intention is to vest the donee then and there with dominion and control over the property and to divest the donor of dominion over it. *See id.* at 853, 496 N.E.2d 869; *see also In re Sussman's Estate* 125 N.Y.S.2d 584, 589 (Surr.Ct.N.Y.Co.1953), *aff'd,* 283 A.D. 1051, 131 N.Y.S.2d 880 (1st Dep't), *app. denied,* 284 A.D. 844, 134 N.Y.S.2d 586 (1st Dep't 1954). As noted in *Sussman,*

to say that the donor must relinquish dominion and control over the property is not, of course, to say that he may not retain any interest in the property or that the donee must be given present enjoyment of absolute ownership. The decisions in this State clearly validate a gift of a remainder interest and a reservation of a life estate in the donor.

*See id.* at 589; *see also Gruen,* 505 N.Y.S.2d at 852, 496 N.E.2d 869 (although father retained possession of painting that he had given to his son, insuring, maintaining, and allowing others to exhibit it, court held that those acts were "not inconsistent with his retention of a life estate").

#### 2. Application

■ Nureyev made a valid gift when he executed the deeds of gift in St. Bart's. He intended then and there to give the Dakota apartment and its contents to RNDF. He executed the necessary documents and delivered them to Weinstein to carry out the transfer on RNDF's behalf. *See Rubenstein v. Rosenthal,* 140 A.D.2d 156, 528 N.Y.S.2d 539, 540 (1st Dep't 1988) (appropriate letters or other writings may be used to constructively deliver property). Although he retained the right to visit the property and agreed to pay for its maintenance, he understood that he was giving up dominion and control over the property and that he would no longer be able to live in the apartment. He knew and understood that he was irrevocably donating the property to RNDF, and that was his intent. Accordingly, defendants' claim that the deeds of gift were invalid testamentary dispositions is rejected.

### B. Nureyev's Mental Capacity

#### 1. Standards

■ Parties are presumed to be competent, and a party asserting incapacity has the burden of proving incompetence. *Feiden v. Feiden,* 151 A.D.2d 889, 542 N.Y.S.2d 860, 862 (3d Dep't 1989). In evaluating mental

---

11. Neither Roza nor Gouzel bothered to attend the trial. Roza and Gouzel had also been in litigation against BPF in state court in New York, in state court in Virginia, and in Monaco. They settled their claims against BPF in accordance with a settlement agreement dated May 5, 1997, whereby BPF agreed, among other things, to pay Roza and Gouzel $1.8 million, to give Roza the right to live rent-free for the remainder of her life in the Monaco apartment, and to give Roza a monthly stipend of $1,500 for as long as she lived.

capacity, courts apply two different standards: one for contracts and one for testamentary instruments.

In contract disputes, mental capacity is determined by a cognitive test: whether the person's mind was "so affected as to render him wholly and absolutely incompetent to comprehend and understand the nature of the transaction." *See Ortelere v. Teachers' Retirement Bd.*, 25 N.Y.2d 196, 303 N.Y.S.2d 362, 367, 250 N.E.2d 460 (Ct.App. 1969) ("[C]ontracts of a mentally incompetent person who has not been adjudicated insane are voidable. Even where the contract has been partly or fully performed it will still be voided upon restoration of the status quo."). In other words, the inquiry is whether the party was capable of making a rational judgment concerning the transaction in question. *See Harrison v. Grobe*, 790 F.Supp. 443, 447 (S.D.N.Y.1992) (quoting *Ortelere*, 303 N.Y.S.2d at 367, 250 N.E.2d 460), *aff'd*, 984 F.2d 594 (2d Cir.1993).

The standard for making a will is less rigorous: less "capacity" is required because a will is a "unilateral disposition of property," sometimes made by a person who is ill and facing death. *In re Estate of ACN*, 133 Misc.2d 1043, 509 N.Y.S.2d 966, 969 (Surr.Ct.N.Y.Co.1986); *see In re Estate of Gearin*, 132 A.D.2d 799, 517 N.Y.S.2d 339, 341 (3d Dep't), *app. denied*, 70 N.Y.2d 613, 524 N.Y.S.2d 432, 519 N.E.2d 343 (Ct.App. 1987). To have the mental capacity to execute a will, the testator need only understand the nature and consequences of executing a will, the nature and extent of the property being disposed of, and the identity of the persons who would be considered the "natural objects of his bounty and his relations to them." *In re Estate of Gearin*, 517 N.Y.S.2d at 341. Because the contractual standard is more exacting than the testamentary standard, a party who satisfies the contractual standard will necessarily meet the testamentary standard. *Harrison*, 790 F.Supp. at 447.

When attempting to deem a party incompetent, it is not sufficient to show a general lack of capacity; it must be shown that the person was incompetent at the time of the transaction. *Feiden v. Feiden*, 151 A.D.2d 889, 542 N.Y.S.2d 860, 862 (3d Dep't 1989). In *Feiden*, the court held that "persons suffering from a disease such as Alzheimer's are not presumed incompetent and may execute a valid deed." *Id.* at 890, 542 N.Y.S.2d 860. Thus, an individual suffering from AIDS would not be presumed incompetent.[12]

### 2. Application

I assume that the more rigorous contract standard for mental capacity applies to Nureyev's making of the deeds of gift in St. Bart's. The evidence clearly and convincingly demonstrates, and I so find, that Nureyev was fully capable of making a rational judgment concerning the transfer of the Dakota apartment and its contents to RNDF. He understood fully what he was doing, and he was fully competent when he executed the deeds of gift.

In the fall of 1992, in the few weeks before he executed the deeds of gift, Nureyev was choreographing *La Bayadère* for the Paris Opera. He was working with dancers and showing them the steps. He was socializing with friends and continuing to lead a full life. He was having intelligent conversations with his friends, his lawyer, and others. Although he was ill and dying, he knew very well what he was doing.

In November 1992, just a few weeks after he signed the deeds of gift, he gave a deposition to perpetuate his testimony in the event Tracy filed suit. Although the circumstances were extremely difficult, he testified in a firm, strong, intelligent, and articulate manner.

Defendants' claim that Nureyev lacked the mental capacity to transfer the property is rejected.

12. The proposition that illness alone does not render a grantor incompetent is supported by other New York cases as well. Testators who have been rendered bedridden by strokes or suffer from diminishing mental states have been held to have the legal capacity to convey property under New York law. *See Harrison*, 790 F.Supp. at 448 (citing *In re Ford's Estate*, 279 A.D. 152, 108 N.Y.S.2d 122 (1st Dep't 1951); *In re Chollar's Will*, 200 Misc. 948, 107 N.Y.S.2d 192 (Surr. Ct. Broome Co.1951); *Broat v. Broat*, 18 N.Y.S.2d 709, 712, 713 (Sup.Ct. Broome Co.1940)).

## C. The Purported Undue Influence

### 1. Standards

A party alleging undue influence must show that:

the influence exercised amounted to a moral coercion, which restrained independent action and destroyed free agency, or which, by importunity which could not be resisted, constrained the testator to do that which was against his free will and desire, but which he was unable to refuse or too weak to resist. It must not be the promptings of affection; the desire of gratifying the wishes of another; the ties of attachment arising from consanguinity, or the memory of kind acts and friendly offices, but a coercion produced by importunity, or by a silent resistless power which the strong will often exercises over the weak and infirm, and which could not be resisted, so that the motive was tantamount to force or fear.

*Matter of Burke*, 82 A.D.2d 260, 441 N.Y.S.2d 542, 548 (2d Dep't 1981) (quoting *Matter of Walther's Will*, 6 N.Y.2d 49, 188 N.Y.S.2d 168, 172, 159 N.E.2d 665 (Ct.App.1959)).

Undue influence may be established by direct or circumstantial evidence, but to avoid a conveyance on the grounds of undue influence, the contestant must show facts entirely inconsistent with the execution of the trust by any means other than undue influence. *Harrison*, 790 F.Supp. at 455 (quoting *Matter of Henderson's Will*, 253 A.D. 140, 1 N.Y.S.2d 871, 875 (4th Dep't 1937)). The general rule is that the party contesting the conveyance has the burden to prove undue influence, but the burden can shift to the party defending the conveyance if the facts prompt a suspicion that undue influence was indeed exerted, such as where a confidential or fiduciary relationship existed between the conveying party and the person who benefits from the conveyance. The mere existence of such a relationship does not, however, prompt a presumption of undue influence without substantial additional evidence. It is only when "it appears prima facie that the parties have been dealing with each other under circumstances of inequality [that] a presumption arises as against the [controlling party], especially if the transaction has resulted in detriment to the [conveying party]." *Harrison*, 790 F.Supp. at 456 (quoting *In re Rogers' Will*, 250 A.D. 26, 293 N.Y.S. 626, 630 (2 Dept.1937)).

Consequently, while the existence of an attorney-client relationship between donor and donee may raise a presumption of undue influence, "the fact that the beneficiary was the guardian, attorney or trustee does not alone create a presumption against a testamentary gift or that it was procured by undue influence." *Harrison*, 790 F.Supp. at 457 (quoting *In re In re Smith*, 95 N.Y. 516 (Ct.App.1884)). Although the existence of this type of relationship may "excite suspicion," it is only one factor to be considered in determining the existence of undue influence. *See id.* at 456.

### 2. Application

Here, I find that Weinstein did not exert any undue influence over Nureyev, principally for four reasons. First, Nureyev was simply not a person who could be unduly influenced. He was a person strong enough to defy the Soviet government, to leave his country and family behind him, to start his life all over again. Etheredge testified that "[n]o one could make him do anything he didn't want to do. I don't think anyone ever told him what to do." (Tr. 296). Similarly, Jude testified that he never saw Nureyev do anything that he did not want to do and that Nureyev was not a person who would allow others to influence him. (Tr. 224).[13] Nureyev did not lose this attribute in the end. He was still able, for example, to cajole his friends to interrupt their own busy lives to travel with him. He still refused to do things that he did not want to do, such as, for

---

**13.** When asked at his deposition whether Nureyev was a "strong-willed individual," Potts laughed, answering: "Yes, very much so." (Potts Dep. at 169). Douce likewise testified that Nureyev could not be easily influenced by others, that he was strong-willed, and "knew exactly what he wants." (Douce Dep. at 130). Besobra- sova testified at her deposition that Nureyev "could ask for information, he could be informed by other people, but not influenced. If he asked you for information, you gave him the information, you saw Rudolf taking it in, putting it somewhere where it could help him, and that is what he wanted." (Besobrasova Dep. at 58).

example, signing the bank transfer documents that Weinstein, on Thurnherr's behalf, had asked him to sign.

Second, Weinstein was not in a position to exert undue influence over Nureyev. Although Nureyev clearly trusted him, Weinstein did not hold any power over Nureyev; they were not in "circumstances of inequality." Indeed, Weinstein had difficulty even getting his bills paid, as he sometimes waited two years to be paid for his services. Moreover, throughout the relevant time Nureyev was surrounded by close friends who cared immensely for him, who would not have let him be disadvantaged by anyone, and Nureyev also had the benefit of advice from Thurnherr.

Third, Weinstein acted in good faith at all times. He sought only to do what was best for Nureyev and to carry out Nureyev's wishes. He carried out his duties in a completely capable and professional manner, and I believe that Nureyev would have been more than pleased with Weinstein's efforts. Defendants contend that Weinstein acted for his own benefit, citing as examples that he was paid an annual salary of $25,000, that his daughter lived rent-free in the Dakota apartment for some months, and that Weinstein and his wife controlled a $7 million foundation. These contentions are rejected. To the contrary, I find that Weinstein and his family acted only in Nureyev's best interests, sometimes at their own expense.[14]

Fourth, Weinstein was not the donee or beneficiary; rather, dance was the beneficiary and Nureyev received certain tax advantages himself. The deeds of gift carried out his precise wishes. He did not want to pay millions of dollars in taxes. At the same time, he had wanted, for many years, to do something financially to promote dance and to ensure that his name and work would carry on after his death. Nureyev made the decision to carry out his wishes, and he did so independently and not as the result of coercion.

Accordingly, defendants' claim of undue influence is rejected as well.

### D. *The Purported Prior Gift*

Finally, Roza and Gouzel contend that the deeds of gift were a nullity because Nureyev had already transferred the property to BPF in April 1992 when he executed the Paris wills and instructions to the BPF trustees. In particular, they rely on the language in the instructions that Nureyev wanted to give "all [his] assets whether movable or immovable and all [his] bank accounts wherever situated (*except real property situated in the United States*) including the shares of Woodburn Estate, the shares of Ballet Monde SA, the property Quai Voltaire, Paris, the property Saint Barthelemy, Leeward Islands, located in the French West Islands, Guadaloupe; La Turbie (owned by SCI L'Arcadie, Monaco)" to BPF at his death. (PX 43) (emphasis added). Defendants argue that because the wording excepted only "real property" in the United States, the Dakota property was conveyed to BPF, for the Dakota property was not "real property" but shares of stock in a cooperative housing corporation, a proprietary lease, and the furnishings and artwork in the apartment.

The argument is rejected. The instructions are badly worded, but Nureyev clearly intended the reference to "real property" in the United States to mean the Dakota apartment and its contents. Moreover, to the extent there was any doubt, Nureyev eliminated that doubt when he issued new wills in New York two weeks later and again when he executed the deeds of gift in October. In addition, BPF, in its letter to the Court, has renounced any claim to the American property in question.

In closing arguments, counsel for Roza and Gouzel suggested that Nureyev did not need to create an American foundation or carve out the American property, that Nureyev could have accomplished his goals by leaving the American property with BPF, and that if Nureyev had been properly advised, he would never have created RNDF and the property would have passed to BPF (and in

---

14. Roza and Gouzel also argue that the deeds of gift are void because they were illegal fraudulent conveyances intended to shield Nureyev's assets from Tracy. This argument is rejected. Although Weinstein did discuss with Nureyev the possibility that a transfer would make it more difficult for Tracy to reach his assets, this was not a significant part of Nureyev's motivation.

part for their benefit). These arguments are also rejected.

The evidence shows that Nureyev would not have done anything differently had Weinstein suggested that he seek advice from another lawyer. Nureyev would not have been willing to spend $25,000 in legal fees for the kind of tax planning that defendants suggest should have been provided to him. (Tr. 989). Nor, in the end, would any different result have been achieved. The estate plan succeeded. The Nureyev estate, which was valued at some $21 million world-wide, paid nothing in estate taxes. More importantly, dance has been promoted in precisely the manner envisioned by Nureyev.

### CONCLUSION

For the reasons set forth above, I hold that the deeds of gift executed by Rudolf Nureyev on October 21, 1992 were and are valid. Accordingly, judgment will be entered in favor of plaintiff Rudolf Nureyev Dance Foundation, with costs. Plaintiff shall submit a proposed judgment on notice within seven days hereof.